OSH

# C5—INTERIOR/EXTERIOR ALKYD　　　　4501 SERIES & 5539, 5540

## Glidden

### MATERIAL SAFETY DATA SHEET

The information contained herein is based on the research, studies, and/or preparation of this data sheet and which The Glidden Company believes to be reliable. However, no warranty is expressed or implied regarding the accuracy of these data. The Glidden Company cannot be responsible for the use of this information or for the results obtained from the use thereof.

It assumes no responsibility for injury to the user or persons adopting it. The user should satisfy himself as to the suitability and completeness of such own use, for the protection of the environment, and the health and safety of his employees and users of his material.

Complies with OSHA hazard communication standard 29CFR1910.1200.

**4501 Series, 5539, 5540**
HMIS Rating

| | |
|---|---|
| Health | *2 |
| Flammability | 2 |
| Reactivity | 0 |

**4570**
HMIS Rating

| | |
|---|---|
| Health | *3 |
| Flammability | 2 |
| Reactivity | 0 |

*See Health Hazard Data for chronic health information.

**Prepared**
November, 1988

THE GLIDDEN COMPANY
925 Euclid Avenue
Cleveland, Ohio 44115
Emergency telephone No.
(216) 828-5600

## GLID-GUARD® Alkyd Industrial Enamel No. 4501 Series; GLID-GUARD® Silicone Alkyd Enamel Nos. 5539, 5540

**DOT Proper Shipping Name:** Paint, UN 1263

**Hazard Class:** Combustible Liquid

**Extinguishing Media:** Dry chemical or foam

## FIRE & EXPLOSION HAZARD DATA

**Unusual Fire and Explosion Hazards:** Closed containers may explode when exposed to extreme heat or fire. Vapors can form explosive mixtures in air at elevated temperatures. May decompose under fire conditions emitting irritant and/or toxic gases.

**Special Fire Fighting Procedures:** Water may be used to cool and protect exposed containers.

## HEALTH HAZARD DATA

**Primary Route(s) of Exposure:** Inhalation
Skin Contact

**Effects of Overexposure:**

**Inhalation:** Irritation of respiratory tract. Prolonged inhalation may lead to fatigue, drowsiness, dizziness and/or lightheadedness, headache, unconordination, nausea, vomiting, central nervous system depression, anesthetic effect or narcosis.

**Skin Contact:** Irritation of skin. Prolonged or repeated contact can cause dermatitis, defatting.

**Eye Contact:** Irritation of eyes. Prolonged or repeated contact can cause blurred vision, redness of eyes, tearing of eyes, severe eye irritation.

**Ingestion:** Amounts ingested incidental to consumer and industrial handling are not likely to cause injury; however, ingestion of larger amounts may cause lung inflammation and damage due to aspiration of material into lungs.

**Notice:** Reports have associated repeated and prolonged occupational overexposure to solvents with permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents may be harmful or fatal.

**Emergency and First Aid Procedures:**

**Inhalation:** Remove to fresh air. Restore and support continued breathing. Get emergency medical attention. Have trained person give oxygen if necessary. Get medical help for any breathing difficulty.

**Skin Contact:** Wash off quickly with plenty of water, then soap and water; remove contaminated clothing. Wash contaminated clothing before reuse.

**Eye Contact:** Flush immediately with large amounts of water, especially under lids, for at least 15 minutes. Obtain emergency medical treatment.

**Ingestion:** If swallowed, obtain medical treatment immediately.

**Medical Conditions Aggravated By Exposure:** This product is not expected to aggravate existing medical conditions; however, ingredients contained in this product have been reported to aggravate preexisting eye, skin, respiratory disorders, lung disorders, asthma-like conditions.

**Supplemental Health Information:** This product contains crystalline silica, which is considered a hazard by inhalation. The International Agency for Research on Cancer (IARC) has determined that there is sufficient evidence for the carcinogenicity of crystalline silica to experimental animals, and limited evidence for the carcinogenicity of crystalline silica to humans. Crystalline silica is also a known cause of silicosis, a noncancerous lung disease.

Exposure to materials in this product have been associated with possible blood abnormalities, liver damage, kidney damage. Excessive inhalation of solvent vapors under uncontrolled conditions may lead to unconsciousness, respiratory failure, asphyxiation, and even death.

**Attention:** Products in this series contain ethylene glycol when tinted with Dramatune. Ethylene glycol can cause severe kidney damage when ingested

## REACTIVITY DATA

**Stability:** Stable

**Incompatibility:** Oxidizers
Acids
Bases
Amines

**Conditions to Avoid:** Elevated temperatures
Contact with oxidizing agent

**Hazardous Decomposition Products:** Carbon Monoxide
Carbon Dioxide

**Hazardous Polymerization:** Will not occur

## SPILL OR LEAK PROCEDURES

**Steps to be taken in case material is released or spilled:** Comply with all applicable health and environmental regulations.

Eliminate all sources of ignition.
Ventilate area.
Spills may be collected with non-combustible absorbent materials.

**Waste Disposal:** Dispose in accordance with all applicable regulations. Avoid discharge to natural waters.

## SPECIAL PROTECTION INFORMATION

**Respiratory Protection:** Control environmental concentrations below applicable standards. Where respiratory protection is required, use only NIOSH/MSHA approved respirators in accordance with OSHA Standard 29 CFR 1910.134.

**Ventilation:** Provide dilution ventilation or local exhaust to prevent build-up of vapors.

**Personal Protective Equipment:** Eye Wash
Safety Shower
Safety Glasses or Goggles
Impervious Gloves

## SPECIAL PRECAUTIONS

**Handling and Storage:** Store below 100°F. Keep away from heat, sparks, and open flame.

**Other Precautions:** Use only with adequate ventilation. Do not take internally. Keep out of reach of children. Avoid contact with skin and eyes, and breathing of vapors. Wash hands thoroughly after handling, especially before eating or smoking. Keep containers tightly closed and upright when not in use. Avoid conditions which result in formation of inhalable particles such as spraying or abrading (sanding) painted surfaces. If such conditions cannot be avoided, use appropriate respiratory protection as directed under Special Protection Information. Empty containers may contain hazardous residues. Ground equipment when transferring to prevent accumulation of static charge.

OSH

# 4501 SERIES, 5539, 5540

Printed in U.S.A.

| PRODUCT CODE NO. | 4501 | 4502 | 4503 | 4510 | 4511 | 4520 | 4525 | 4537 | 4540 | 4541 | 4543 | 4550 | 4551 | 4554 | 4560 | 4562 | 4564 | 4570 | 4573 | 4574 | 4580 | 4587 | 5539 | 5540 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ingredients, Wt. %:** | | | | | | | | | | | | | | | | | | | | | | | | |
| •Distillates (Petroleum), Hydro-Treated | 2-7 | 2-7 | 2-7 | | | | | | | | | | | | | | | | | | | | | |
| •Solvent Naphtha (Petroleum), Light, Arom. | | | | | | | | | | | | | | | | | | | | | | | | |
| •Metal Oxide Silicate | | | | | | | | | | | | | | | 19-23 | | | 19-23 | | | | | | |
| •Calcium Carbonate‡ | | | 10-15 | | | | | | | | | | | | 20-25 | | | 20-25 | | | | | | |
| •Carbon Black | | | | 6-11 | 6-11 | | | | | | 1-5 | | | | | | | | | | | | | |
| Gluteraldime Orange | | | | | | | | | | | | | | | | | | | | | | | | |
| •Crystalline Silica, Quartz | | | | | | 1-5 | 1-5 | | | | | | | | <1 | | | <1 | | | | | | |
| •Ethylbenzene (II) | | | | | | | | | | | | | | | | | | | | | | | | |
| •Distillates (Petroleum), Hydro-Treated, Light | 8-13 | 8-13 | 8-11 | 8-11 | 12-17 | 1-5 | 20-25 | 8-13 | 12-17 | 10-16 | 16-21 | 8-11 | 6-11 | 6-11 | 6-11 | 46-51 | 6-11 | 18-23 | 1-6 | 18-23 | 10-16 | 8-13 | 22-27 | 38-43 |
| •Solvent Naphtha (Petroleum), Medium, Aliph. | 19-25 | 22-27 | 24-29 | 34-39 | 30-35 | 48-51 | 33-37 | 34-39 | 28-33 | 30-35 | 22-27 | 23-33 | 49-45 | 38-41 | 28-33 | 6-11 | 38-41 | 28-33 | 46-51 | 30-35 | 34-39 | 28-33 | 22-27 | 6-11 |
| •Organophilic Clay | | | | 1-5 | 1-5 | 1-5 | 1-5 | 1-5 | 1-5 | 1-5 | 1-5 | 1-5 | 1-5 | 1-5 | | | 1-5 | | 1-5 | | 1-5 | 1-5 | | |
| •Metallic Modified Rosin Ester | | | | | | | | | | | | | 1-5 | | 1-5 | 1-5 | | | | | | | | |
| •Organophilic Clay | | | | 1-5 | 1-5 | | 1-5 | 1-5 | 1-5 | 1-5 | 1-5 | | 1-5 | 1-5 | 1-5 | 1-5 | 1-5 | | 1-5 | | 1-5 | 1-5 | | |
| •Titanium Dioxide | 18-23 | 12-17 | 2-7 | 34-39 | 20-25 | 26-31 | 26-31 | 4-9 | 7-12 | 22-27 | 1-5 | 22-27 | 29-33 | 2-7 | 1-5 | 6-11 | 2-7 | 4-9 | 4-9 | 18-23 | 1-5 | 12-17 | 28-31 | |
| •Alkyd Resin | 14-23 | 20-25 | 20-25 | 24-39 | 20-25 | | 33-32 | 26-31 | 14-19 | 18-23 | 22-27 | 18-23 | 28-33 | 29-31 | 26-31 | 34-39 | 29-31 | 38-41 | | 18-23 | 24-29 | 22-27 | | |
| •Alkyd Resin | 12-17 | 12-17 | 14-18 | 19-15 | 10-16 | | | 19-15 | 18-23 | | 10-16 | 19-15 | 16-15 | 8-13 | 14-19 | | 16-16 | | 10-15 | 10-15 | 12-17 | 12-17 | | |
| •Alkyd Resin | | | | | 10-16 | | | | | | | | | | | | | | | | | | | |
| Hansa Yellow | | | 2-7 | 2-7 | | | | | 4-9 | 19-15 | | | | | | | | | | | | | | |
| Ferri-Ferro Cyanide Complex | | | | | | | | | | | | | | | | | | | | | | | | |
| •Metal Oxide | | | | | | | 1-5 | | | | 1-5 | | 1-5 | | | 2-7 | 2-7 | | | | | | | |
| m-Nitro-p-Tol-sulfonanilide sulphated | | | | | | | | | | | | | | | | | | | | | | | | |
| •Yellow Iron Oxide | | | | | 6-11 | | | | | | | | | | | | | | 1-5 | | | | | |
| •Basic Zinc Molybdate (I) | | | | | | | 4-9 | 4-9 | 1-5 | 1-6 | 1-6 | 1-5 | | 2-7 | 1-5 | 4-9 | | 4-9 | | | 4-9 | 1-5 | | |
| Siliceous Alkyd Resin | | | | | | | | | | | | | | | | | | | | | | | | |
| •Magnesium Silicate Hydrate | | | | | | | | | | 10-15 | | | | | | | | | | | | | | |
| **Physical Data** | | | | | | | | | | | | | | | | | | | | | | | | |
| % Volatility by Vol. | 54.4 | 55.2 | 55.9 | 57.8 | 59.0 | 60.4 | 49.9 | 59.3 | 52.2 | 59.8 | 57.6 | 58.1 | 60.2 | 55.9 | 60.0 | 63.0 | 55.9 | 55.3 | 62.0 | 57.7 | 59.7 | 55.0 | 51.4 | 53.1 |
| Wt. per Gallon, lbs. | 9.1 | 8.8 | 8.8 | 8.8 | 7.9 | 7.7 | 8.9 | 8.1 | 8.7 | 8.3 | 8.3 | 9.3 | 7.8 | 7.3 | 7.7 | 8.0 | 7.8 | 11.8 | 7.9 | 8.9 | 7.7 | 8.5 | 9.6 | 8.5 |
| Boiling Range, °F. | 308-374 | 308-374 | 308-374 | 308-374 | 308-374 | 308-374 | 273-368 | 308-374 | 308-374 | 308-374 | 308-374 | 308-374 | 308-374 | 308-374 | 308-374 | 316-360 | 308-374 | 316-360 | 308-374 | 308-374 | 308-374 | 308-374 | 308-374 | 308-374 |
| Flash Point, °F. | 105 | 105 | 105 | 102 | 102 | 105 | 105 | 105 | 106 | 106 | 105 | 105 | 102 | 109 | 109 | 108 | 108 | 100 | 104 | 105 | 105 | 105 | 105 | 105 |
| Lower Explosive Limit | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 1.0 | 0.7 | 1.0 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 |

• Hazardous ingredients as defined by OSHA, ACGIH or The Glidden Company.
**†† Denotes use is not present when used hot, alkylamine glycol will be present. Refer to MSDS or Parameter No. 1760 System for details.
(1) OSHA SECTION 313 CHEMICAL
(2) OSHA SECTION 302 EHS

OSH

| CHEMICAL NAME/COMPONENT NAME | CAS. NO. | ACGIH-TLV 8-HOUR TWA | STEL | OSHA-PEL 8-HOUR TWA | LEL | V.P. |
|---|---|---|---|---|---|---|
| Distillates (Petroleum), Hydro-Treated Aliphatic Hydrocarbon Blend | 64742-47-8 | 100 ppm/s | Not Established | 500 ppm/s | 1.0 | 1 @ 68°F. |
| Solvent Naphtha (Petroleum), Light, Aromatic Hydrocarbon Blend | 64742-95-6 | 100 ppm/s | Not Established | 500 ppm/s | 1.0 | 80.0 @ 100°F. |
| Metal Oxide Silicate/Brown Iron Oxide | 1309-37-1 | 8.1 mg/m³ | Not Established | 110 mg/m³*/(%SiO₂ + 2)‡ | N.A. | N.A. |
| Calcium Carbonate/Limestone | 1317-65-3 | 10 mg/m³ | Not Established | 15 mg/m³ | N.A. | N.A. |
| Carbon Black/Carbon Black | 1333-86-4 | 3.5 mg/m³ | Not Established | 3.5 mg/m³ | N.A. | N.A. |
| Crystalline Silica, Quartz/Silica, Crystalline, Quartz | 14808-60-7 | 0.1 mg/m³ ‡ | Not Established | 10 mg/m³/(% SiO₂ + 2)‡ | N.A. | N.A. |
| Bis Vanadium Orange/Distillation Orange | 3468-63-1 | 10 mg/m³ | Not Established | 15 mg/m³* | N.A. | N.A. |
| Ethyl Benzene/Ethyl Benzene | 100-414 | 100 ppm | 125 ppm | 100 ppm | 1.0 | 7.1 @ 68°F. |
| Distillates (Petroleum), Hydro-Treated, Light Mineral Spirits | 64742-47-8 | 100 ppm/s | Not Established | 500 ppm/s | 0.7 | 2.0 @ 68°F. |
| Solvent Naphtha (Petroleum), Medium, Aliph./Mineral Spirits | 64742-88-7 | 100 ppm/s | Not Established | 500 ppm/s | 1.0 | 5 @ 77°F. |
| Organophilic Clay/Organophilic Clay | 71011-27-3 | 10 mg/m² | Not Established | 15 mg/m³ | N.A. | N.A. |
| Maleic Modified Resin Ester/Pentaerythritol Ester | 68333-69-7 | Not Established | Not Established | Not Established | N.A. | N.A. |
| Organophilic Clay/Organophilic Clay | 68911-87-5 | 10 mg/m³ | Not Established | 15 mg/m³ | N.A. | N.A. |
| Titanium Dioxide/Titanium Dioxide, Rutile | 13463-67-7 | 10 mg/m³ | Not Established | 15 mg/m³* | N.A. | N.A. |
| Alkyd Resin/Alkyd Resin | 68459-17-6 | Not Established | Not Established | Not Established | N.A. | N.A. |
| Alkyd Resin/Alkyd Resin | 67700-92-9 | Not Established | Not Established | Not Established | N.A. | N.A. |
| Alkyd Resin/Alkyd Resin | 68604-05-5 | Not Established | Not Established | Not Established | N.A. | N.A. |
| Hansa Yellow/Hansa Yellow | 13515-44-7 | Not Established | Not Established | Not Established | N.A. | N.A. |
| Basell Ferric Cyanide Complex/Iron Blue | Supplier Confidential | 10 mg/m³ | Not Established | 15 mg/m³ | N.A. | N.A. |
| Metal Oxide/Red Iron Oxide | 1309-37-1 | 10 mg/m³ | Not Established | 15 mg/m³* | N.A. | N.A. |
| m-Nitro-p-Toluene/Sulphanaphthylide/Toluidine Red | 2425-85-6 | 10 mg/m³ | Not Established | 15 mg/m³* | N.A. | N.A. |
| Yellow Iron Oxide/Yellow Iron Oxide | 51274-00-1 | 10 mg/m³ | Not Established | 15 mg/m³* | N.A. | N.A. |
| Basic Zinc Molybdate/Basic Zinc Molybdate | 83760-32-3 | 10 mg/m³ | Not Established | 15 mg/m³* | N.A. | N.A. |
| Silicone Alkyd Resin/Silicone Alkyd Resin | Supplier Confidential | Not Established | Not Established | Not Established | N.A. | N.A. |
| Magnesium Silicate, Hydrous/Talc | 14807-96-6 | 2 mg/m³‡ | Not Established | 20 mppcf | N.A. | N.A. |

Carcinogenicity Listed By: IARC Monograph? Yes   IARC Monograph? No   OSHA Regulated? No

LEL—The lower explosive limit is the lowest concentration (% of volatiles in air) that will produce a flash of fire when an ignition source is present.
V.P.—Vapor pressure in millimeters of mercury at the indicated temperature.
mppcf—Millions of particles per cubic foot.
N.A.—Not applicable.
mg/m³—Milligrams per cubic meter.
ppm—Parts per million.
‡Respirable Dust
§As Standard solvent
IARC listing due to Crystalline Silica.

Printed in U.S.A

OSH

**5086, 5450, 5634, 10325, 10688, 10689, 1185, 5950, 5069**

# MATERIAL SAFETY DATA SHEET

The information contained herein is presented in good faith and is believed to be accurate as of the date of preparation of this data sheet and which The Glidden Company believes to be reliable. However, no warranty is expressed or implied regarding the accuracy of this data or the results to be obtained from the use thereof. The Glidden Company assumes no responsibility for injury to the recipient or to third persons or for any damage to any property and recipient assumes all such risks. The data relate only to the specific material designated herein, and do not relate to use in combination with any other material or in any process.

Complies with OSHA Hazard Communication Standard 29CFR 1910.1200.

| 1180, 1185, 5067 HMIS Rating | |
|---|---|
| Health | *2 |
| Flammability | 3 |
| Reactivity | 0 |

| 5780, 5700 HMIS Rating | |
|---|---|
| Health | *3 |
| Flammability | 2 |
| Reactivity | 0 |

| All Other HMIS Rating | |
|---|---|
| Health | *2 |
| Flammability | 2 |
| Reactivity | 0 |

*See Health Hazard Data for chronic health information.

Prepared
November, 1988

THE GLIDDEN COMPANY
925 Euclid Avenue
Cleveland, Ohio 44115
Emergency Telephone No.
(216) 826-5495

## ULTRA-HIDE® Alkyd Spray Eggshell Dry Fog No 1180; Alkyd Spray Semi-Gloss Dry Fog No. 1185; Alkyd Spray Flat Dry Fog No. 5067; Alkyd Gloss Sani-Glene Enamel No. 5069; Alkyd Eggshell Enamel No. 5000 Series; Nos. 5086, 5450, 5634, 10325, 10688, 10689; Alkyd Semi-Gloss Enamel No. 5950; Alkyd Flat Enamel No. 5700 Series

DOT Proper Shipping Name: Paint, UN 1263

## FIRE & EXPLOSION HAZARD DATA

Hazard Class: Combustible Liquid, except 1180, 1185, 5067 are Flammable Liquid.

Extinguishing Media: Dry chemical or foam

Unusual Fire and Explosion Hazards: Closed containers may explode when exposed to extreme heat or fire. Vapors can form explosive mixtures in air at elevated temperatures. May decompose under fire conditions emitting irritant and/or toxic gases.

Special Fire Fighting Procedures: Water may be used to cool and protect exposed containers.

## HEALTH HAZARD DATA

Primary Route(s) of Exposure: Inhalation
Skin Contact

Effects of Overexposure:

Inhalation: Irritation of respiratory tract. Prolonged inhalation may lead to mucous membrane irritation, fatigue, drowsiness, dizziness and/or lightheadedness, headache, uncoordination, nausea, central nervous system depression, anesthetic effect or narcosis.

Skin Contact: Irritated skin. Prolonged or repeated contact can cause dermatitis, defatting.

Eye Contact: Irritation of eyes. Prolonged or repeated contact can cause blurred vision, tearing of eyes, redness of eyes, severe eye irritation, corneal injury.

Ingestion: Amounts ingested incidental to consumer and industrial handling are not likely to cause injury; however, ingestion of larger amounts may cause injury. Refer to the section on aspiration of material into lungs.

Notice: Reports have associated repeated and prolonged occupational overexposure to solvents with permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents may be harmful or fatal.

Emergency and First Aid Procedures:

Inhalation: Remove to fresh air. Restore and support continued breathing. Get emergency medical attention. Have trained person give oxygen if necessary. Get medical help for any breathing difficulty.

Skin Contact: Wash off quickly with plenty of water, then soap and water; remove contaminated clothing. Get medical attention before reuse.

Eye Contact: Flush immediately with large amounts of water, especially under lids, for at least 15 minutes. Obtain emergency medical treatment.

Ingestion: If swallowed, obtain medical treatment immediately.

Medical Conditions Aggravated By Exposure: This product is not expected to aggravate existing medical conditions; however, ingredients contained in this product have been reported to aggravate preexisting eye, skin, respiratory disorders, lung disorders, asthma-like conditions.

Supplemental Health Information: This product contains crystalline silica, which is considered a hazard by inhalation. The International Agency for Research on Cancer (IARC) has determined that there is sufficient evidence for the carcinogenicity of crystalline silica to experimental animals, and limited evidence for the carcinogenicity of crystalline silica to humans. Crystalline silica is also a known cause of silicosis, a noncancerous lung disease.

Exposure to materials in this product have been associated with possible blood abnormalities, liver damage, kidney damage. Excessive inhalation of solvent vapors under uncontrolled conditions may lead to unconsciousness, respiratory failure, asphyxiation, and even death.

Attention: Products in this series contain ethylene glycol when tinted with Dramatone. Ethylene glycol can cause severe kidney damage when ingested and has been shown to cause birth defects in laboratory animals.

## REACTIVITY DATA

Stability: Stable

Incompatibility: Oxidizers
Acids
Bases
Amines

Conditions to Avoid: Elevated temperatures
Contact with oxidizing agent

Hazardous Decomposition Products: Carbon Monoxide
Carbon Dioxide

Hazardous Polymerization: Will not occur

## SPILL OR LEAK PROCEDURES

Steps to be taken in case material is released or spilled: Comply with all applicable health and environmental regulations.

Eliminate all sources of ignition.

Ventilate area.

Spills may be collected with non-combustible absorbent materials.

Waste Disposal: Dispose in accordance with all applicable regulations. Avoid discharge to natural waters.

## SPECIAL PROTECTION INFORMATION

Respiratory Protection: Control environmental concentrations below applicable limits. When airborne concentrations are excessive with skin and eyes, and if breathing protection is required, use only NIOSH/MSHA approved respirators in accordance with OSHA Standard 29 CFR 1910.134.

Ventilation: Provide dilution ventilation or local exhaust to prevent build-up of vapors.

Personal Protective Equipment: Eye Wash
Safety Shower
Safety Glasses or Goggles
Impervious Gloves

## SPECIAL PRECAUTIONS

Handling and Storage: Store below 100°F., except 1180, 1185, 5067 store below 80°F. Keep away from heat, sparks, and open flame.

Other Precautions: Use only with adequate ventilation. Do not take internally. Keep out of reach of children. Avoid contact with skin and eyes, and breathing of vapors. Wash hands thoroughly after handling, especially before eating or smoking. Keep containers tightly closed and upright when not in use. Avoid conditions and materials which may affect the stability of product (see appropriate product sections). Avoid breathing of vapors such as spraying or abrading (sanding) or from inadequate ventilation. Use appropriate respiratory protection as directed under Special Protection Information. Empty containers may contain hazardous residues. Ground equipment when transferring to prevent accumulation of static charge.

OSH

## 5086 SERIES, 1180, 1185, 5069, 5067, 5000 SERIES, 5700 SERIES, 5950

| PRODUCT CODE &C. | 5086 | 1032S | 1088B | 1083S | 5034 | 5450 | 1180 | 1185 | 5049 | 5067 | 5096 | 5018 | 5359 | 5080 | 5087 | 5700 | 5718 | 5700 | 5717 | 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ingredients, Wt. %** | | | | | | | | | | | | | | | | | | | | |
| Titanium Dioxide | 16-21 | 22-27 | 8-13 | | | 14-19 | 10-15 | 14-19 | 26-31 | 6-11 | 28-23 | 16-21 | 22-27 | 1-5 | 10-15 | 13-16 | 10-15 | 1-5 | 8-13 | 1 |
| Aluminum Silicate, Hydrous | 2-7 | 2-7 | 1-5 | | 1-5 | 2-7 | 14-19 | | | | 1-5 | 1-5 | 1-5 | 2-7 | 2-7 | | 4-9 | | 2-7 | 1 |
| Aluminum Silicate, Anhydrous | | | | | | | | | | | | | | | | 8-11 | | | | 7 |
| Calcium Carbonate | 22-27 | 18-23 | 34-39 | 40-46 | 16-21 | 16-21 | 30-35 | 22-37 | | 16-15 | 12-17 | 16-21 | 14-19 | 26-31 | 16-21 | 30-35 | 36-41 | 22-27 | 34-39 | 7 |
| Distillates (Petroleum), Hydro-Treated | 16-23 | 20-25 | 20-25 | 22-27 | 14-19 | 14-19 | | 22-37 | 8-13 | | 16-23 | 16-21 | 20-25 | 18-23 | 16-23 | 26-35 | 28-33 | 31-36 | 32-37 | 11 |
| Distillates (Petroleum), Hydro-Treated, Light | 4-9 | 4-9 | 4-9 | 4-9 | 12-17 | 12-17 | | | 20-25 | 2-7 | | 12-17 | 8-13 | 14-19 | 14-19 | | | 1-5 | | 3 |
| Magnesium Aluminum Silicate | | | | | 1-5 | 1-5 | | | | | | | | | | | | | | 1 |
| Carbon Black | | | | | 1-5 | | | | | | | | | | | | | | | |
| Alkyd Resin | | | | | | 2-7 | | | | | | 2-7 | | | | | | | | |
| Alkyd Resin | 8-13 | 8-13 | 3-13 | 8-13 | | | | 18-21 | 32-37 | 4-6 | | | | | | | | 2-7 | | 2 |
| Alkyd Resin | 4-9 | 4-9 | 8-11 | 6-11 | 4-9 | 2-7 | | 26-31 | | | 4-9 | 4-9 | 4-9 | 4-9 | 4-9 | 6-11 | 8-12 | 8-13 | 8-13 | 10 |
| Polyurethane Alkyd | | | | | 16-21 | 16-21 | | | | | 12-17 | 12-17 | 10-15 | 10-15 | 12-17 | | | | | |
| Alkyd Resin | | | | | 4-9 | 4-9 | | | | | | 2-7 | | 4-9 | 2-7 | | | | | 6 |
| Alkyd Resin | | | | | | | 10-15 | 16-21 | | | | | | | | | | | | |
| Solvent Naphtha (Petroleum), Light Aliph. | | | | | | | 12-17 | 26-31 | | 2-7 | | | | | | | | | | |
| Solvent Naphtha (Petroleum), Medium Aliph. | | | | | | | 13-16 | | | 8-13 | | | | | | | | | | 61 |
| Bisphenone IH | | | | | | | | | 1-5 | | | | | | | | | | | |
| Organophilic Clay | | | | | | | | | 1-5 | | | | | | | | | | | |
| Magnesium Silicate Hydrate | | | | | | | | | | 10-15 | | | | | | | | | | |
| Silicon Dioxide | | | | | | | | | | 18-23 | | | | | | 1-5 | | 18-23 | | |
| Water | | | | | | | | | | | | | | | | | | | | |
| **Physical Data** | | | | | | | | | | | | | | | | | | | | |
| % Volatile by Vol. | 50.6 | 51.8 | 50.8 | 51.9 | 52.8 | 55.4 | 60.8 | 54.2 | 51.6 | 82.1 | 55.3 | 54.8 | 55.7 | 55.4 | 53.1 | 59.9 | 57.8 | 60.1 | 61.9 | 67. |
| Wt. per Gallon, lbs. | 11.3 | 11.4 | 11.1 | 11.6 | 10.4 | 9.2 | 12.3 | 11.0 | 9.8 | 12.0 | 10.5 | 10.3 | 9.6 | 9.6 | 8.9 | 11.6 | 11.8 | 10.8 | 11.1 | 97 |
| Boiling Range, °F. | 306-388 | 306-388 | 306-388 | 306-388 | 306-388 | 306-388 | 249-388 | 249-290 | 273-386 | 249-274 | 306-388 | 306-388 | 306-388 | 306-388 | 306-388 | 306-388 | 306-388 | 306-388 | 306-388 | 306- |
| Flash Point, °F. | 105 | 102 | 102 | 102 | 102 | 117 | 70 | 50 | 105 | 87 | 117 | 190 | 190 | 116 | 116 | 105 | 105 | 105 | 105 | 111 |
| Lower Explosive Limit | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.9 | 0.9 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.3 | 1.0 | 1.8 | 0.7 | 1.0 | 0.2 |

* Hazardous Ingredients as defined by OSHA, NIOSH or The Baldwin Company.
(1) Distillates is used in the anhydrous form without present. Refer to MSDS on Distillates No. 1750 Series for details.
(1) 54RA SECTION 313 CHEMICAL
(2) 54RA SECTION 302 EHS

No. 231394A

OSH

| CHEMICAL NAME/COMMON NAME | CAS. NO. | ACGIH-TLV 8-HOUR TWA | ACGIH-TLV STEL | OSHA-PEL | LEL | V.P. |
|---|---|---|---|---|---|---|
| Titanium Dioxide/Titanium Dioxide, Rutile | 13463-67-7 | 10 mg/m³ | Not Established | 15 mg/m³ | N.A. | N.A. |
| Aluminum Silicate, Hydrous/Clay | 1332-58-7 | 10 mg/m³ | Not Established | 15 mg/m³ | N.A. | N.A. |
| Amorphous Silicate, Anhydrous/Clay | 22008-80-3 | 10 mg/m³ | Not Established | 15 mg/m³ | N.A. | N.A. |
| Calcium Carbonate/Limestone | 1317-65-3 | 10 mg/m³ | Not Established | 15 mg/m³ | N.A. | N.A. |
| Distillates (Petroleum) Hydro-Treated/Aliphatic Hydrocarbon Blend | 64742-47-8 | 100 ppm§ | Not Established | 500 ppm§ | 1.0 | 1.00 @ 68°F. |
| Distillates (Petroleum) Hydro-Treated, Light/Mineral Spirits | 64742-47-8 | 300 ppm§ | Not Established | 500 ppm§ | 0.7 | 3.00 @ 68°F. |
| Magnesium Aluminum Silicate/Attapulgite | 8031-18-3 | 10 mg/m³ | Not Established | 15 mg/m³ | U.A. | N.A. |
| Carbon Black/Carbon Black | 1333-86-4 | 3.5 mg/m³ | Not Established | 3.5 mg/m³ | N.A. | N.A. |
| Alkyd Resin/Alkyd Resin | 68439-45-7 | Not Established | Not Established | Not Established | N.A. | N.A. |
| Alkyl Resin/Alkyl Resin | 67701-02-3 | Not Established | Not Established | Not Established | N.A. | N.A. |
| Alkyl Resin/Alkyl Resin | Supplier Confidential | Not Established | Not Established | Not Established | N.A. | N.A. |
| Alkyl Resin/Alkyd Resin | 68604-95-5 | Not Established | Not Established | Not Established | N.A. | N.A. |
| Polyurethane Alkyd/Polyurethane Alkyd | 67989-28-0 | Not Established | Not Established | Not Established | N.A. | N.A. |
| Alkyd Resin/Alkyd Resin | 68549-17-5 | Not Established | Not Established | Not Established | N.A. | N.A. |
| Alkyd Resin/Alkyd Resin | 68002-12-3 | Not Established | Not Established | Not Established | N.A. | N.A. |
| Solvent Naphtha (Petroleum), Light Aliph./VM&P Naphtha | 64742-89-8 | 300 ppm | Not Established | 500 ppm× | 0.9 | 20 @ 68°F. |
| Solvent Naphtha (Petroleum), Medium Aliph./Mineral Spirits | 64742-88-7 | 100 ppm§ | Not Established | 500 ppm§ | 1.0 | 5 @ 77°F. |
| Ethylbenzene/Ethylbenzene | 100-41-4 | 100 ppm | 125 ppm | 100 ppm | 1.0 | 7.1 @ 68°F. |
| Organophilic Clay/Organophilic Clay | 71011-27-3 | 10 mg/m³ | Not Established | 15 mg/m³ | N.A. | N.A. |
| Magnesium Silicate Refined/Talc | 14807-96-6 | 2 mg/m³ | Not Established | 20 mg/m³ | N.A. | N.A. |
| Silicon Dioxide/Silica, Crystalline, Quartz | 14808-60-7 | 0.1 mg/m³† | Not Established | (10mg/m³)(% SiO₂ + 2)† | N.A. | N.A. |
| Water/Water, Tap | 7732-18-5 | Not Established | Not Established | Not Established | N.A. | 17.5 @ 68°F. |

Carcinogenicity Listed By: NTP? No   IARC Monographs? Yes   OSHA Regulated? No

LEL—The lower explosive limit is the lowest concentration (% of volatiles in air) that will produce a flash of fire when an ignition source is present.
V.P.—Vapor pressure in millimeters of mercury at the indicated temperature.
mppcf—Millions of particles per cubic foot.
N.A.—Not applicable.
mg/m³—Milligrams per cubic meter.
ppm—Parts per million.
†Respirable Dust
‡Supplier Designated Internal Standard
§As Distilled solvent
×As Petroleum Distillates
MRC Entry due to Crystalline Silica.

No. 33134A

Printed in U.S.A.

OSH

**FF   INTERIOR LATEX**   **4000, 4100 & 5118 SERIES & 5111**

## Glidden

# MATERIAL SAFETY DATA SHEET

The information contained herein is based on data considered accurate. However, no warranty is expressed or implied regarding the accuracy of this data or the results to be obtained from the use thereof. The Glidden Company shall not be responsible for the use of this information, or of any product, method or apparatus mentioned and you must make your own determination of its suitability and completeness for your own use, for the protection of the environment, and for the health and safety of your employees and users of this material.

Complies with OSHA hazard communication standard 29CFR1910.1200.

| 4000, 4100 & 5118 Series | HMIS Rating |
|---|---|
| Health | *3 |
| Flammability | 1 |
| Reactivity | 0 |

| 5111, 4087 | HMIS Rating |
|---|---|
| Health | 1 |
| Flammability | 0 |
| Reactivity | 0 |

*See Health Hazard Data for chronic health information.

Prepared
November, 1988

THE GLIDDEN COMPANY
925 Euclid Avenue
Cleveland, Ohio 44115
Emergency Telephone No.
(216) 826-5588

## SPRED® ULTRA™ Flat Latex Wall & Trim Paint No. 4000 Series; SPRED® ULTRA™ Eggshell Latex Wall & Trim Paint No. 4100 Series; ULTRA-HIDE® Latex Eggshell Enamel No. 5118 Series; SPRED® ULTRA™Primer Sealer No. 5111

### FIRE & EXPLOSION HAZARD DATA

DOT Proper Shipping Name: Paint

Hazard Class: Not restricted

Extinguishing Media: Dry chemical or foam

Unusual Fire and Explosion Hazards: Closed containers may burst if exposed to extreme heat or fire.

Special Fire Fighting Procedures: Water may be used to cool and protect exposed containers.

### HEALTH HAZARD DATA

Primary Route(s) of Exposure: Inhalation
                       Skin Contact

Effects of Overexposure:
Inhalation: Prolonged inhalation may lead to mucous membrane irritation, drowsiness, dizziness and/or lightheadedness, headache, nausea.
Skin Contact: Irritation of skin.
Eye Contact: Irritation of eyes.
Ingestion: Amounts ingested incidental to consumer and industrial handling are not likely to cause injury; however, ingestion of large amounts could cause serious injury.

Emergency and First Aid Procedures:
Inhalation: Remove to fresh air. Restore and support continued breathing. Get emergency medical attention. Have trained person give oxygen if necessary. Get medical help for any breathing difficulty.
Skin Contact: Wash off quickly with plenty of water, then soap and water; remove contaminated clothing. Wash contaminated clothing before reuse.
Eye Contact: Flush immediately with large amounts of water, especially under lids for at least 15 minutes. Obtain emergency medical treatment.
Ingestion: If swallowed, obtain medical treatment immediately.

Medical Conditions Aggravated By Exposure: This product is not expected to aggravate existing medical conditions; however, ingredients contained in this product have been reported to be aggravate preexisting eye, skin, respiratory disorders, lung disorders, kidney disorders.

Supplemental Health Information: Oral consumption of products containing ethylene glycol may produce adverse health effects. Ingestion of large volumes of ethylene glycol may result in kidney damage and/or failure. Studies with laboratory animals show that high doses of ethylene glycol, administered orally, produce birth defects in rats and rabbits. There is, however, no currently available information to suggest that ethylene glycol has caused birth defects in humans.

This product contains crystalline silica, which is considered a hazard by inhalation. The International Agency for Research on Cancer (IARC) has determined that there is sufficient evidence for the carcinogenicity of crystalline silica to experimental animals, and limited evidence for the carcinogenicity of crystalline silica to humans. Crystalline silica is also a known cause of silicosis, a non-cancerous lung disease.

### REACTIVITY DATA

Stability: Stable

Incompatibility: Oxidizers
                Acids

Conditions to Avoid: Elevated temperatures
                Contact with oxidizing agent

Hazardous Decomposition Products: Carbon Monoxide
                                      Carbon Dioxide

Hazardous Polymerization: Will not occur

### SPILL OR LEAK PROCEDURES

Steps to be taken in case material is released or spilled: Comply with all applicable health and environmental regulations.
    Ventilate area.
    Spills may be collected with absorbent materials.

Waste Disposal: Dispose in accordance with all applicable regulations. Avoid discharge to natural waters.

### SPECIAL PROTECTION INFORMATION

Respiratory Protection: Control environmental concentrations below applicable standards. Where respiratory protection is required, use only NIOSH/MSHA approved respirators as indicated in accordance with OSHA Standard 29 CFR 1910.134.

Ventilation: Provide dilution ventilation or local exhaust to prevent build-up of vapors.

Personal Protective Equipment: Eye Wash
                                 Safety Shower
                                 Safety Glasses or Goggles
                                 Impervious Gloves

### SPECIAL PRECAUTIONS

Handling and Storage: Store below 100°F.

Other Precautions: Use only with adequate ventilation. Do not take internally. Keep out of reach of children. Avoid contact with skin and eyes, and breathing of vapors. Wash hands after using and before eating or smoking. Keep containers tightly closed and upright to prevent leakage. Empty containers may contain product residue (including vapor) and can be dangerous. Do not cut, puncture or weld on or near this container. Do not reuse. Intentional misuse by deliberately concentrating and inhaling the contents can be harmful or fatal. FOR INDUSTRIAL USE ONLY. Apply only to adequately ventilated surfaces. If such conditions cannot be avoided, use appropriate respiratory protection as directed under Special Protection Information.

# 4000, 4100 & 5118 SERIES, 5111

| CHEMICAL NAME/COMMON NAME | CAS. NO. | 8-HOUR TWA ACGIH TLV | STEL | OSHA PEL | LEL | V.P. |
|---|---|---|---|---|---|---|
| Aluminum Silicate, Hydrous/Clay | 1332-58-7 | 10 mg/m³ | Not Established | 15 mg/m³ | N.A. | N.A. |
| Aluminum Silicate, Anhydrous/Clay | 22765-90-3 | 10 mg/m³ | Not Established | 15 mg/m³ | N.A. | N.A. |
| Calcium Carbonate/Limestone | 1317-65-3 | 10 mg/m³ | Not Established | 15 mg/m³ | N.A. | N.A. |
| 1,2 Ethanediol/Ethylene Glycol | 107-21-1 | C 50 ppm | Not Established | Not Established | 3.2 | <0.10 @ 68°F |
| Silicon Dioxide/Silica, Crystalline, Quartz | 14808-60-7 | 0.1 mg/m³‡ | Not Established | 100 mg/m³/%SiO₂ + 2% | N.A. | N.A. |
| Sodium Aluminosilicate/Amorphous Silicate | 1344-00-9 | 10 mg/m³ | Not Established | Not Established | N.A. | N.A. |
| Titanium Dioxide/Titanium Dioxide, Rutile | 13463-67-7 | 10 mg/m³ | Not Established | 15 mg/m³ | N.A. | N.A. |
| 2,2,4-Trimethyl-1,3-Pentanediol Monoisobutyrate/Ester Alcohol | 25265-77-4 | Not Established | Not Established | Not Established | 0.9 | 1.0 @ 180°F |
| Acrylic Latex/Acrylic Latex | Supplier Confidential | Not Established | Not Established | Not Established | N.A. | N.A. |
| Vinyl Acrylic Resin/Vinyl Acrylic Resin | 25085-01-0 | Not Established | Not Established | Not Established | N.A. | N.A. |
| Water/Water, Tap | 7732-18-5 | Not Established | Not Established | Not Established | N.A. | 17.5 @ 68°F |

Carcinogenicity Listed by: NTP? No   IARC Monograph? Yes   OSHA Regulated? No

* Hazardous ingredients as defined by OSHA, ACGIH or The Glidden Company.
(1) SARA SECTION 313 CHEMICAL
(2) SARA SECTION 302 EHS

Approximately 2CD for all products on this sheet
Greater than 2CD for all products on this sheet
Not applicable for any product on this sheet

C-Ceiling—The concentration that should not be exceeded even instantaneously.
LEL—The lower explosive limit is the lowest concentration of material in air that will produce a flash of fire when an ignition source is present.
V.P.—Vapor pressure in millimeters of mercury at the indicated temperature.
N.A.—Not applicable.
mg/m³—Milligrams per cubic meter.
ppm—Parts per million.
#Respirable Dust
‡IARC listing has no Crystalline Silica.

OSH

Printed in U.S.A.

No. 33117A

INTERIOR/EXTERIOR LATEX ENAMELS    OSH    6900 SERIES



**Glidden**

## MATERIAL SAFETY DATA SHEET

The information contained herein is based on the available data of sales of the ingredients of this product and which The Glidden Company believes to be reliable. However, no warranty is expressed or implied regarding the accuracy of this data. The Glidden Company shall not be held responsible for the use of this information, or of any product, method or apparatus mentioned and you must make your own determination of its suitability and completeness for your own use, for the protection of the environment, and the health and safety of your employees and users of this material.

Complies with OSHA hazard communication standard 29CFR1910.1200.

*See Health Hazard Data for chronic health information.

| 6900 Series HMIS Rating | |
|---|---|
| Health | *2 |
| Flammability | 1 |
| Reactivity | 0 |

Prepared
November, 1988

THE GLIDDEN COMPANY
925 Euclid Avenue
Cleveland, Ohio 44115

Emergency Telephone No.
(216) 826-5588

## LIFEMASTER® II
Acrylic Enamel
No. 6900 Series

DOT Proper Shipping Name: Paint

Hazard Class: Not restricted

### FIRE & EXPLOSION HAZARD DATA

Extinguishing Media: Dry chemical or foam

Unusual Fire and Explosion Hazards: Closed containers may burst if exposed to extreme heat or fire.

Special Fire Fighting Procedures: Water may be used to cool and protect exposed containers.

### HEALTH HAZARD DATA

Primary Route(s) of Exposure:    Inhalation    Skin Contact

Effects of Overexposure:

Inhalation: Irritation of respiratory tract. Prolonged inhalation may lead to mucous membrane irritation, dizziness and/or lightheadedness, headache, nausea.

Skin Contact: Irritation of skin.

Eye Contact: Irritation of eyes. Prolonged or repeated contact can cause redness of eyes.

Ingestion: Amounts ingested incidental to consumer and industrial handling are not likely to cause injury; however, ingestion of larger amounts could cause serious injury.

Notice: Reports have associated repeated and prolonged occupational overexposure to solvents with permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents may be harmful or fatal.

Emergency and First Aid Procedures:

Inhalation: Remove to fresh air. Restore and support continued breathing. Get emergency medical attention. Have trained person give oxygen if necessary. Get medical help for any breathing difficulty.

Eye Contact: Wash eyes quickly with plenty of water, lift upper and lower lids, for at least 15 minutes. Obtain emergency medical treatment.

Skin Contact: Wash off quickly with plenty of water, use soap and water; remove contaminated clothing. Wash contaminated clothing before reuse.

Ingestion: If swallowed, obtain medical treatment immediately.

Medical Conditions Aggravated By Exposure: This product is not expected to aggravate existing medical conditions; however, ingredients contained in this product have been reported to aggravate preexisting eye, skin, respiratory disorders.

Supplemental Health Information:

Attention: Products in this series contain ethylene glycol which when taken with Disulfiram. Ethylene glycol can cause serious kidney damage when ingested and has been shown to cause birth defects in laboratory animals.

### REACTIVITY DATA

Stability: Stable

Incompatibility: Oxidizers
                Bases

Conditions to Avoid: Elevated temperatures
                     Contact with oxidizing agent

Hazardous Decomposition Products: Carbon Monoxide
                                  Carbon Dioxide

Hazardous Polymerization: Will not occur

### SPILL OR LEAK PROCEDURES

Steps to be taken in case material is released or spilled: Comply with all applicable health and environmental regulations.
Ventilate area.

Spills may be collected with absorbent materials.

Waste Disposal: Dispose in accordance with all applicable regulations. Avoid discharge to natural waters.

### SPECIAL PROTECTION INFORMATION

Respiratory Protection: Control environmental concentrations below applicable standards. Where respiratory protection is required, use only NIOSH/MSHA approved respirators in accordance with OSHA Standard 29 CFR 1910.134.

Ventilation: Provide dilution ventilation or local exhaust to prevent build-up of vapors.

Personal Protective Equipment:    Eye Wash
                                  Safety Shower
                                  Safety Glasses or Goggles
                                  Impervious Gloves

### SPECIAL PRECAUTIONS

Handling and Storage: Store below 100°F. Keep from freezing.

Other Precautions: Use only with adequate ventilation. Do not take internally. Keep out of reach of children. Avoid contact with skin and eyes, and breathing of vapors. Wash hands thoroughly after handling, especially before eating or smoking. Keep containers tightly closed and upright when not in use. If sanding is done, wear a dust mask to avoid breathing of sanding dust.

OSH

# 6900 SERIES

| PRODUCT CODE NO. | 6900 | 6916 | 6925 | 6930 | 6997 |
|---|---|---|---|---|---|
| ** Ingredients, Wt. % | | | | | |
| • Ethanol, 2- (2-Butoxyethoxy) (1) | 4-8 | 2-7 | 4-8 | 4-9 | 2-9 |
| • Titanium Dioxide | 22-27 | 18-23 | 22-27 | 1-5 | 6-13 |
| • Ethanol, 2- (2-Methoxyethoxy) (1) | 1-5 | 2-7 | 1-5 | 1-5 | 1-9 |
| • 2,2,4-Trimethyl-1,3-Pentanediol Monoisobutyrate | | | | 1-5 | 1-5 |
| • Water | 39-44 | 42-47 | 39-44 | 52-57 | 49-54 |
| • Acrylic Resin | 21-26 | 21-26 | 21-26 | 26-30 | 24-29 |
| Physical Data | | | | | |
| % Volatile by Vol. | 63.7 | 65.2 | 63.6 | 69.1 | 68.6 |
| Wt. per Gallon, lbs. | 10.4 | 10.0 | 10.4 | 8.9 | 9.1 |
| Boiling Range, °F. | Approximately 212 for all products on this sheet | | | | |
| Flash Point, °F. | Greater than 200 for all products on this sheet | | | | |
| Lower Explosive Limit | Not applicable for any product on this sheet | | | | |

• Hazardous Ingredients as defined by OSHA, ACGIH or The Glidden Company.
** If Urmestene is used to tint, ethylene glycol will be present.
  Refer to MSDS on Drawdene No. 1700 Series for details.
(1) SARA SECTION 313 CHEMICAL
(2) SARA SECTION 302 EHS

| | | ACGIH-TLV | | OSHA-PEL | | |
|---|---|---|---|---|---|---|
| CHEMICAL NAME/COMMON NAME | CAS. NO. | 8-HOUR TWA | STEL | 8-HOUR TWA | LEL | V.P. |
| Ethanol, 2- (2-Butoxyethoxy)-/Diethylene Glycol Monobutyl Ether | 112-34-5 | Not Established | Not Established | Not Established | 0.9 | 0.01 @ 68°E |
| Titanium Dioxide/Titanium Dioxide, Resin | 13463-67-7 | 10 mg/m³ | Not Established | 15 mg/m³ | N.A. | N.A. |
| Ethanol, 2- (2-Methoxyethoxy)-/DI EG Monomethyl Ether | 111-77-3 | Not Established | Not Established | Not Established | 0.6 | 1.0 @ 100°F. |
| 2,2,4-Trimethyl-1,3-Pentanediol Monoisobutyrate/Ester Alcohol | 25265-77-4 | Not Established | Not Established | Not Established | N.A. | 17.5 @ 68°E |
| Water/Water, Tap | 7732-18-5 | Not Established | Not Established | Not Established | N.A. | N.A. |
| Acrylic Resin/Acrylic Resin | Supplier Confidential | Not Established | Not Established | Not Established | N.A. | N.A. |

Carcinogenicity Listed By: NTP? No   IARC Monograph? No   OSHA Regulated? No

LEL—The lower explosive limit is the lowest concentration (% of volatiles in air) that will produce a flash of fire when an ignition source is present.
V.P.—Vapor pressure in millimeters of mercury at the indicated temperatures.
N.A.—Not applicable.
mg/m³—Milligrams per cubic metre.

Printed in U.S.A.

OSH

**CHRYSLER CORPORATION**
**MANUFACTURING TECHNICAL INSTRUCTIONS**

| SUBJECT: | INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL | | | |
|---|---|---|---|---|

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 1 OF 18 |

## I. PURPOSE

To alert Division and Plant personnel regarding the types and classifications of hazardous and potentially hazardous non-production material; to assist in assuring against risk to employees health, to the environment, and to Chrysler facilities. To assure compliance with Provincial, Federal, State and Local health, safety and environmental laws and regulations.

## II. SCOPE

This instruction is limited to the procurement and/or use of hazardous and potentially hazardous non-production materials.

Note: Information on procurement and use of Hazardous Production Materials may be obtained by referencing Engineering Standard #CS-9003.

## III. FUNCTIONS AFFECTED

Manufacturing Engineering and/or Specifying Activity (RFM originator)
    Facilities Engineering
    Production Engineering
Industrial Hygiene & Toxicology
Employee Safety
Product Development (Ref.)
Procurement & Supply (Ref.)
Pollution Prevention & Remediation

REFERENCE

Corporate Procedure #115
Industrial Hygiene & Toxicology Bulletins
Pollution Prevention & Remediation Procedure #1-102
Occupational Safety and Health Manual
Manufacturing Technical Instruction MP128
Corporate Procedure #164
Purchasing Procedure #65-12
Chrysler Standard NP6199 Reprocessed Oil Approval Procedure

## IV. OPERATIONS AFFECTED

Chrysler Corporation

OSH

CHRYSLER CORPORATION
MANUFACTURING TECHNICAL INSTRUCTIONS

| SUBJECT: | INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON-PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL | | | | |
|---|---|---|---|---|---|
| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | | SHEET |
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | | 2 OF 18 |

## V. DEFINITIONS

1. Restricted Materials

Non-production materials which, by virtue of their potential health, safety or environmental impact and/or effects on costs or product quality, can be coded for purchase only after being approved for use through the Non-Production Test System (R.P.A.S.). (Ref. Corporate Procedure #115, MP-128) See Appendix "D" for restricted commodity code groups.

Restricted Chemicals

Chemicals with extremely severe health, safety or environmental impact. See Appendix "A".

Potentially Hazardous Material

Materials with a high potential for containing a hazardous chemical or having hazardous properties. See Appendix "B".

Regulated Chemicals

Materials that are regulated by various government agencies due to their potential impact on the environment.

Appropriate Laws, Regulations & Statutes

Provincial, Federal, State, and Local health, safety and environmental laws which may affect the use or disposal of chemical materials by Chrysler Corporation.

See Appendix "E".

## VI. INSTRUCTIONS

All new hazardous, regulated or potentially hazardous Non-Production Materials which are also restricted materials shall be processed via the Restricted Parts Approval System (Corporate Procedure No. 115 and MP-128).

OSH
CHRYSLER CORPORATION
MANUFACTURING TECHNICAL INSTRUCTIONS

SUBJECT:   INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON-PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 3 OF 18 |

VI.   INSTRUCTIONS (Continued)

Materials processed through RPAS shall be reviewed by the Non-Production Standards Activity, Industrial Hygiene & Toxicology, Procurement & Supply, Employee Safety, Pollution Prevention & Remediation, as appropriate, as well as other functions as necessary.

NOTE:     NPM test approvals are plant specific.

New plants may use existing approved Non-Production Materials at their discretion, however, it is their responsibility to ensure that all performance, safety and environmental requirements are met. New plants requesting to use materials under test elsewhere shall be required to process them through RPAS.

Labels, Data Sheets and Training

The specifying activity in conjunction with the Plant Safety Administrator shall see that all hazardous or potentially hazardous materials used at Chrysler are labeled in accordance with appropriate Provincial, Federal, State and Local laws. This includes bulk and secondary or "break down" containers.

A Hazard Communication Sheet (HCS) or Material Safety Data Sheet (MSDS) shall be available in each plant for every hazardous or potentially hazardous material in use. Note that an HCS or MSDS shall be present prior to or concurrent with receipt of the material. This data is normally on file in the plant Safety Office.

Employees shall be trained in the safe use of all hazardous or potentially hazardous materials with which they work. Training shall be in accordance with the appropriate "Hazard Communication Training" program.

Procurement & Use

All hazardous or potentially hazardous materials used at Chrysler shall have a valid non-production commodity code number or a valid temporary code. (For restricted groups the temporary number contains a "T"; for non-restricted

OSH

| CHRYSLER CORPORATION<br>MANUFACTURING TECHNICAL INSTRUCTIONS | | | | |
|---|---|---|---|---|
| SUBJECT: | INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON-PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL | | | |
| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 4 OF 18 |

VI.  INSTRUCTIONS (continued)

groups the temporary number contains an "A".) Materials not directly purchased by Chrysler (i.e., materials used by a supplier to maintain a coolant system), shall be approved and coded.

For numbered/coded materials purchased through corporate accounts payable, the Corporate Industrial Hygiene & Toxicology Department shall request information from suppliers to produce Hazard Communication Sheets (HCS's) and shall maintain a database to produce HCS's and required technical reports to assist plants in meeting the various laws and regulations.

For hazardous or potentially hazardous materials transferred from other Chrysler locations, the receiving plant shall record the presence of the material on the HASCON System.  Locations unable to access HASCON directly shall inform the Industrial Hygiene & Toxicology Department of the volume and identity of the material (part number/commodity code, supplier, manufacturer, brand name) in writing.  The Industrial Hygiene & Toxicology Department shall see that the material is added to the plant's HASCONS inventory of hazardous materials.

Hazardous and potentially hazardous materials shall not be purchased using local purchase orders (LPOs) or using requisition numbers instead of part numbers.  This restriction includes all materials furnished by suppliers such as samples, etc. Complete Non-Production Material Commodity Codes shall be used for all purchases.  For autobuy purchases must correspond to the approved source for restricted commodities.

For non-standard acquisitions, i.e. approved materials bought by petty cash or local purchase order (LPO), approved materials provided by vendors, materials bought with a requisition number instead of a part number, or unapproved materials purchased, provided by vendors or otherwise brought into Chrysler Corporation facilities, it is the responsibility of the manager of the using department to ensure that such materials meet and are used in accordance with all Provincial, Federal, State and Local health, safety and environmental laws and regulations.

OSH
**CHRYSLER CORPORATION**
**MANUFACTURING TECHNICAL INSTRUCTIONS**

| SUBJECT: | INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL | | | |
|---|---|---|---|---|
| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 5 OF 18 |

## VI.   INSTRUCTIONS (continued)

### Disposal

Materials shall be disposed of in accordance with appropriate Provincial, Federal, State and Local rules and statutes, especially RCRA. Materials defined as hazardous under RCRA and waste streams containing such materials shall be kept separate from materials defined as (RCRA) non-hazardous. An effort shall be made to not contaminate non-hazardous waste streams with hazardous materials.

### General

OSHA hazardous chemical content, and DOT and RCRA hazard classification, may be obtained from the Hazard Communication Sheets (HCS). Additional details on labels, HCS/MSDS and training may be obtained from the Chrysler Hazard Communication Program found in the (Chrysler) Occupational Safety and Health Manual.

Details on purchasing and approval of non-production materials can be obtained from Corporate Procedures No. 115 and 164, and Manufacturing Technical Instruction MP-128.

The use of potentially hazardous materials shall be minimized. Non-hazardous material substitutes should be used whenever possible. Processes utilizing regulated chemicals shall be reviewed, and non-regulated chemicals substituted when practical.

Any product that contains reprocessed oils must be approved in accordance with Chrysler Standard NP6199 "Supplier Certification Program for Products containing Reprocessed Oils".

The use of restricted chemicals will be limited. Restricted chemicals will be eliminated from use within Chrysler Corporation where possible.

The responsible specifying activity must make ongoing reviews in an attempt to eliminate, replace or reduce usage of SMI-102 hazardous materials. It is expected therefore that results of such efforts shall be reflected in an annual "Pollution Prevention Plan Report " and in the annual update of the "SARA Toxic Reduction Report". The plants will be audited on this requirement based on annual usage figures.

OSH

### CHRYSLER CORPORATION
### MANUFACTURING TECHNICAL INSTRUCTIONS

**SUBJECT:** INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON-PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 6 OF 18 |

APPENDIX A   (PART 1)

RESTRICTED CHEMICALS - C.A.S. NUMBER LISTING

| C.A.S NUMBER | SUBSTANCE NAME |
|---|---|
| MULTIPLE | ARSENIC COMPOUNDS |
| MULTIPLE | ANTIMONY COMPOUNDS |
| MULTIPLE | BARIUM COMPOUNDS |
| MULTIPLE | CADMIUM COMPOUNDS |
| MULTIPLE | CHROMIUM COMPOUNDS |
| MULTIPLE | COAL TAR PITCH VOLATILES |
| MULTIPLE | COBALT COMPOUNDS |
| MULTIPLE | CYANIDE COMPOUNDS |
| MULTIPLE | 3,3'. DICHLOROBENZIDINE SALTS |
| MULTIPLE | LEAD COMPOUNDS |
| MULTIPLE | MERCURY COMPOUNDS |
| MULTIPLE | PHENOLS |
| MULTIPLE | POLYCHLORINATED BIPHENYLS (PCB'S) |
| MULTIPLE | POLYAROMATIC HYDROCARBONS (PAH'S) |
| 00050-00-0 | FORMALDEHYDE |
| 00053-96-3 | 2-ACETYLAMINOFLUORENE |
| 00056-23-5 | CARBON TETRACHLORIDE |
| 00057-57-8 | BETA-PROPIOLACTONE |
| 00060-11-7 | 4-DIMETHYLAMINOAZOBENZENE |
| 00062-75-9 | N-NITROSODIMETHYLAMINE |
| 00067-56-1 | METHANOL* |
| 00067-64-1 | ACETONE |
| 00067-66-3 | CHLOROFORM (TRICHLOROMETHANE) |
| 00071-36-3 | BUTYL ALCOHOL |
| 00071-43-2 | BENZENE |
| 00071-55-6 | 1,1,1 TRICHLOROETHANE (METHYL CHLOROFORM) |
| 00074-87-3 | CHLOROMETHANE (METHYL CHLORIDE) |
| 00075-01-4 | VINYL CHLORIDE |

*These are regulated and restricted only when the concentration exceeds 5% by volume.

This list (Appendix A) should not be construed as being all inclusive.

OSH
## CHRYSLER CORPORATION
## MANUFACTURING TECHNICAL INSTRUCTIONS

SUBJECT: INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 7 OF 18 |

APPENDIX A    (PART 1) continued

RESTRICTED CHEMICALS - C.A.S. NUMBER LISTING

| C.A.S NUMBER | SUBSTANCE NAME |
|---|---|
| 00075-07-0 | ACETALDEHYDE |
| 00075-09-2 | METHANE CHLORIDE |
| 00075-15-0 | CARBON DISULFIDE |
| 00075-35-4 | 1,1 DICHLOROETHYLENE |
| 00075-56-9 | PROPYLENE OXIDE |
| 00075-69-4 | CFC 11 (FREON 11) |
| 00075-71-8 | CFC 12 (FREON 12) |
| 00076-13-1 | CFC 113 (FREON 113) |
| 00076-14-2 | CFC 114 (FREON 114) |
| 00078-93-3 | METHYL ETHYL KETONE |
| 00079-00-5 | 1,1,2 TRICHLOROETHANE |
| 00079-01-6 | TRICHLOROETHYLENE |
| 00079-10-7 | ACRYLIC ACID |
| 00079-46-9 | 2-NITROPROPANE |
| 00084-74-2 | DI-N-BUTYL PHTHALATE |
| 00085-68-7 | BUTYL BENZYL PHTHALATE* |
| 00087-68-3 | HEXACHLOROBUTADIENE |
| 00091-20-3 | NAPHTHALENE |
| 00091-59-8 | BETA-NAPHTHYLAMINE |
| 00091-94-1 | 3,3' DICHLOROBENZIDINE |
| 00092-67-1 | 4-AMINOBIPHENYL |
| 00092-87-5 | BENZIDINE |
| 00092-93-3 | 4-NITROBIPHENYL |
| 00095-48-7 | O-CRESOL |
| 00095-50-1 | ORTHODICHLOROBENZENE |
| 00098-82-8 | CUMENE |
| 00098-95-3 | NITROBENZENE |
| 00100-41-4 | ETHYLBENZENE |
| 00100-42-5 | STYRENE |

*These are regulated and restricted only when the concentration exceeds 5% by volume.

This list (Appendix A) should not be construed as being all inclusive.

OSH

### CHRYSLER CORPORATION
### MANUFACTURING TECHNICAL INSTRUCTIONS

| SUBJECT: | INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON-PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL |
|---|---|

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 8 OF 18 |

## APPENDIX A   (PART 1) continued

### RESTRICTED CHEMICALS - C.A.S. NUMBER LISTING

| C.A.S NUMBER | SUBSTANCE NAME |
|---|---|
| 00101-14-4 | 4,4' METHYLENE BIS-2-CHLOROANILINE |
| 00101-68-8 | METHYLENE-BIS-PHENYLISOCYANATE (MDI) |
| 00101-77-9 | 4,4' METHYLENE DIANILINE (MDA) |
| 00106-44-5 | P-CRESOL |
| 00107-06-2 | 1,2 DICHLOROETHANE |
| 00107-21-1 | ETHYLENE GLYCOL |
| 00107-30-2 | METHYL CHLOROMETHYL ETHER |
| 00108-39-4 | M-CRESOL |
| 00108-88-3 | TOLUENE |
| 00108-90-7 | CHLOROBENZENE |
| 00108-95-2 | PHENOL |
| 00109-86-4 | ETHYLENE GLYCOL METHYL ETHER |
| 00110-49-6 | ETHYLENE GLYCOL METHYL ETHER ACETATE |
| 00110-54-3 | N-HEXANE |
| 00110-80-5 | ETHYLENE GLYCOL ETHYL ETHER |
| 00111-15-9 | ETHYLENE GLYCOL ETHYL ETHER ACETATE |
| 00111-44-4 | BIS(2-CHLOROETHYL) ETHER |
| 00117-81-7 | DIETHYL HEXYL PHTHALATE (DEHP) |
| 00117-84-0 | DI-N-OCTYL PHTHALATE (DOP) |
| 00118-74-1 | HEXACHLOROBENZENE |
| 00121-14-2 | 2,4 DINITROTOLUENE |
| 00123-91-1 | 1,4 DIOXANE |
| 00127-18-4 | TETRACHLOROETHYLENE (PERCHLOROETHYLENE) |
| 00131-11-3 | DIMETHYL PHTHALATE |
| 00134-32-7 | ALPHA-NAPHTHYLAMINE |
| 00141-32-2 | BUTYL ACRYLATE |
| 00151-56-4 | ETHYLENEIMINE |
| 00542-88-1 | BIS-CHLOROMETHYL ETHER |
| 00591-78-6 | METHYL-N-BUTYL KETONE |
| 01319-77-3 | CRESYLIC ACID |
| 01332-21-4 | ASBESTOS |
| 07439-97-6 | MERCURY |

*These are regulated and restricted only when the concentration exceeds 5% by volume.

This list (Appendix A) should not be construed as being all inclusive.

CHRYSLER CORPORATION
OSH
MANUFACTURING TECHNICAL INSTRUCTIONS

SUBJECT: INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON-
PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS
MATERIAL

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 9 OF 18 |

APPENDIX A   (PART 1) continued

RESTRICTED CHEMICALS - C.A.S. NUMBER LISTING

| C.A.S NUMBER | SUBSTANCE NAME |
|---|---|
| 07440-38-2 | ARSENIC |
| 07440-39-3 | BARIUM |
| 07440-43-9 | CADMIUM |
| 07440-47-3 | CHROMIUM |
| 07664-39-3 | HYDROGEN FLUORIDE* |
| 07789-06-2 | STRONTIUM CHROMATE |
| 12001-28-4 | ASBESTOS (CROCIDOLITE) |
| 12001-29-5 | ASBESTOS (CHRYSOLITE) |
| 12002-51-6 | POTASSIUM CRESYLATE |
| 12172-73-5 | ASBESTOS (AMOSITE) |
| 12656-85-8 | MOLYBDATE RED |
| 13768-00-8 | ASBESTOS (ACTINOLITE) |
| 14567-73-8 | ASBESTOS (TREMOLITE) |
| 17068-78-9 | ASBESTOS (ANTHOPHYLITE) |

*These are regulated and restricted only when the
concentration exceeds 5% by volume.

This list (Appendix A) should not be construed as being all
inclusive.

OSH

# CHRYSLER CORPORATION
## MANUFACTURING TECHNICAL INSTRUCTIONS

**SUBJECT:** INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON-PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 10 OF 18 |

### APPENDIX A   (PART 2)

### RESTRICTED CHEMICALS — ALPHABETICAL LISTING.

| SUBSTANCE NAME | C.A.S. NUMBER |
|---|---|
| 1,1 DICHLOROETHYLENE | 00075-35-4 |
| 1,1,1 TRICHLOROETHANE (METHYL CHLOROFORM) | 00071-55-6 |
| 1,1,2 TRICHLOROETHANE | 00079-00-5 |
| 1,2 DICHLOROETHANE | 00107-06-2 |
| 1,4 DIOXANE | 00123-91-1 |
| 2,4 DINITROTOLUENE | 00121-14-2 |
| 2-ACETYLAMINOFLUORENE | 00053-96-3 |
| 2-NITROPROPANE | 00079-46-9 |
| 3,3'DICHLOROBENZIDINE | 00091-94-1 |
| 3,3'DICHLOROBENZIDINE SALTS | MULTIPLE |
| 4,4' METHYLENE BIS-2-CHLOROANILINE | 00101-14-4 |
| 4,4' METHYLENE DIANILINE (MDA) | 00101-77-9 |
| 4-AMINOBIPHENYL | 00092-67-1 |
| 4-DIMETHYLAMINOAZOBENZENE | 00060-11-7 |
| 4-NITROBIPHENYL | 00092-93-3 |
| ACETALDEHYDE | 00075-07-0 |
| ACETONE | 00067-64-1 |
| ACRYLIC ACID | 00079-10-7 |
| ALPHA-NAPHTHYLAMINE | 00134-32-7 |
| ANTIMONY COMPOUNDS | MULTIPLE |
| ARSENIC | 07440-38-2 |
| ARSENIC COMPOUNDS | MULTIPLE |
| ASBESTOS | 01332-21-4 |
| ASBESTOS (ACTINOLITE) | 13768-00-8 |
| ASBESTOS (AMOSITE) | 12172-73-5 |
| ASBESTOS (ANTHOPHYLITE) | 17068-78-9 |
| ASBESTOS (CHRYSOTILE) | 12001-29-5 |
| ASBESTOS (CROCIDOLITE) | 12001-28-4 |
| ASBESTOS (TREMOLITE) | 14567-73-8 |
| BARIUM | 07440-39-3 |
| BARIUM COMPOUNDS | MULTIPLE |
| BENZENE | 00071-43-2 |
| BENZIDINE | 00092-87-5 |
| BETA-NAPHTHYLAMINE | 00091-59-8 |

*These are regulated and restricted only when the concentration exceeds 5% by volume.

This list (Appendix A) should not be construed as being all inclusive.

Continued on next page

OSH

## MANUFACTURING TECHNICAL INSTRUCTIONS

| SUBJECT: | INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL | | | |
|---|---|---|---|---|
| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 11 OF 18 |

### APPENDIX A   (PART 2) continued

### RESTRICTED CHEMICALS - ALPHABETICAL LISTING

| SUBSTANCE NAME | C.A.S. NUMBER |
|---|---|
| BETA-PROPIOLACTONE | 00057-57-8 |
| BIS(2-CHLOROETHYL)ETHER | 00111-44-4 |
| BIS-CHLOROMETHYL ETHER | 00542-88-1 |
| BUTYL ACRYLATE | 00141-32-2 |
| BUTYL ALCOHOL | 00071-36-3 |
| BUTYL BENZYL PHTHALATE * | 00085-68-7 |
| CADMIUM | 07440-43-9 |
| CADMIUM COMPOUNDS | MULTIPLE |
| CARBON DISULFIDE | 00075-15-0 |
| CARBON TETRACHLORIDE | 00056-23-5 |
| CFC 11 (FREON 11) | 00075-69-4 |
| CFC 113 (FREON 113) | 00076-13-1 |
| CFC 114 (FREON 114) | 00076-14-2 |
| CFC 12 (FREON 12) | 00075-71-8 |
| CHLOROBENZENE | 00108-90-7 |
| CHLOROFORM (TRICHLOROMETHANE) | 00067-66-3 |
| CHLOROMETHANE (METHYL CHLORIDE) | 00074-87-3 |
| CHROMIUM | 07440-47-3 |
| CHROMIUM COMPOUNDS | MULTIPLE |
| COAL TAR PITCH VOLATILES | MULTIPLE |
| COBALT COMPOUNDS | MULTIPLE |
| CRESYLIC ACID | 01319-77-3 |
| CUMENE | 00098-82-8 |
| CYANIDE COMPOUNDS | MULTIPLE |
| DI-N-BUTYL PHTHALATE | 00084-74-2 |
| DI-N-OCTYL PHTHALATE (DOP) | 00117-84-0 |
| DIETHYL HEXYL PHTHALATE (DEHP) | 00117-81-7 |
| DIMETHYL PHTHALATE | 00131-11-3 |
| ETHYLBENZENE | 00100-41-4 |
| ETHYLENE GLYCOL | 00107-21-1 |
| ETHYLENE GLYCOL METHYL ETHER | 00109-86-4 |
| ETHYLENE GLYCOL METHYL ETHER ACETATE | 00110-49-6 |
| ETHYLENE GLYCOL ETHYL ETHER | 00110-80-5 |
| ETHYLENE GLYCOL ETHYL ETHER ACETATE | 00111-15-9 |

*These are regulated and restricted only when the
 concentration exceeds 5% by volume.

This list (Appendix A) should not be construed as being all
inclusive.

Continued on next page

DSH

# CHRYSLER CORPORATION
## MANUFACTURING TECHNICAL INSTRUCTIONS

SUBJECT:   **INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON-PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL**

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 12 OF 18 |

APPENDIX A   (PART 2) continued

RESTRICTED CHEMICALS - ALPHABETICAL LISTING

| SUBSTANCE NAME | C.A.S. NUMBER |
|---|---|
| ETHYLENEIMINE | 00151-56-4 |
| FORMALDEHYDE | 00050-00-0 |
| HEXACHLOROBENZENE | 00118-74-1 |
| HEXACHLOROBUTADIENE | 00087-68-3 |
| HYDROGEN FLUORIDE * | 07664-39-3 |
| LEAD COMPOUNDS | MULTIPLE |
| M-CRESOL | 00108-39-4 |
| MERCURY | 07439-97-6 |
| MERCURY COMPOUNDS | MULTIPLE |
| METHANE CHLORIDE | 00075-09-2 |
| METHANOL * | 00067-56-1 |
| METHYL CHLOROMETHYL ETHER | 00107-30-2 |
| METHYL ETHYL KETONE | 00078-93-3 |
| METHYL-N-BUTYL KETONE | 00591-78-6 |
| METHYLENE-BIS-PHENYLISOCYANATE | 00101-68-8 |
| MOLYBDATE RED | 12656-85-8 |
| N-HEXANE | 00110-54-3 |
| N-NITROSODIMETHYLAMINE | 00062-75-9 |
| NAPHTHALENE | 00091-20-3 |
| NITROBENZENE | 00098-95-3 |
| O-CRESOL | 00095-48-7 |
| ORTHODICHLOROBENZENE | 00095-50-1 |
| P-CRESOL | 00106-44-5 |
| PHENOL | 00108-95-2 |
| PHENOLS | MULTIPLE |
| POLYAROMATIC HYDROCARBONS (PAH'S) | MULTIPLE |
| POLYCHLORINATED BIPHENYLS (PCB'S) | MULTIPLE |
| POTASSIUM CRESYLATE | 12002-51-6 |
| PROPYLENE OXIDE | 00075-56-9 |
| STRONTIUM CHROMATE | 07789-06-2 |
| STYRENE | 00100-42-5 |
| TETRACHLOROETHYLENE (PERCHLOROETHYLENE) | 00127-18-4 |
| TOLUENE | 00108-88-3 |
| TRICHLOROETHYLENE | 00079-01-6 |
| VINYL CHLORIDE | 00075-01-4 |

*These are regulated and restricted only when the concentration exceeds 5% by volume.

This list (Appendix A) should not be construed as being all inclusive.

OSH

## MANUFACTURING TECHNICAL INSTRUCTIONS

| SUBJECT: | INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON-PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL |

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 13 OF 18 |

### Appendix A (continued)

### REGULATED CHEMICALS

The substances identified below are of concern during specific manufacturing processes. Generally, those processes of concern generate fumes or dusts. This is most often associated with welding, sanding and grinding. Some stamping processes can also cause concern. If the substance is contained in a material and the material is not processed, use of the material will not be restricted.

### ALPHABETICAL LISTING

| SUBSTANCE NAME | C.A.S. NUMBER |
|---|---|
| ALUMINUM (FUME OR DUST) | 7429-90-5 |
| BERYLLIUM | 7440-41-7 |
| BERYLLIUM COMPOUNDS | MULTIPLE |
| MANGANESE | 7439-96-5 |
| MANGANESE COMPOUNDS | MULTIPLE |
| NICKEL | 7440-02-0 |
| NICKEL COMPOUNDS | MULTIPLE |
| SELENIUM | 7782-49-2 |
| SELENIUM COMPOUNDS | MULTIPLE |
| ZINC (FUME OR DUST) | 7440-66-6 |
| ZINC COMPOUNDS | MULTIPLE |

### C.A.S. # LISTING

| C.A.S. NUMBER | SUBSTANCE NAME |
|---|---|
| MULTIPLE | BERYLLIUM COMPOUNDS |
| MULTIPLE | MANGANESE COMPOUNDS |
| MULTIPLE | NICKEL COMPOUNDS |
| MULTIPLE | SELENIUM COMPOUNDS |
| MULTIPLE | ZINC COMPOUNDS |
| 7429-90-5 | ALUMINUM (FUME OR DUST) |
| 7439-96-5 | MANGANESE |
| 7440-02-0 | NICKEL |
| 7440-41-7 | BERYLLIUM |
| 7440-66-6 | ZINC (FUME OR DUST) |
| 7782-49-2 | SELENIUM |

This list (Appendix A) should not be construed as being all inclusive.

OSH

## CHRYSLER CORPORATION
## MANUFACTURING TECHNICAL INSTRUCTIONS

**SUBJECT:** INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON-PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 14 OF 18 |

Appendix B

## POTENTIALLY HAZARDOUS NON-PRODUCTION MATERIALS
### Non-Production Commodity Codes

| Major Group | Intermediates |
|---|---|
| 02  Abrasives | All |
| 06 Belts, Belting, Brake Lining | 635, 800, 805, 825, 900 |
| *12  Chemicals, Compounds | All |
| 27 Electrical Supplies | 032 |
| 31 Fuel | All |
| 33 Furnace and Boiler Repair Parts | 107, 625 |
| 35 Hardware | 267 |
| *45 Lab and Plating Supplies | 730, 740 |
| *47 Lubricants and Coolants | All |
| 51 Lumber, Building and Construction | 015, 025, 075, 128, 130, 140, 285, 680 700, 725, 750, 765, 800 |
| 57 Metals Ferrous & Non-Ferrous | All |
| 62 Packing and Oil Seals | 050, 090, 093, 095, 100, 111, 112, 113, 176, 185, 190, 195, 200, 205, 230, 252, 255, 270, 275, 300, 459, 460, 465, 532, 535, 565, 568, 570 |
| *64 Photographic, Microfilming & Reproduction | 495 |
| 65 Paint and Paint Ingredients | All |
| 67 Plumbing Supplies | 165, 425 |

This list (Appendix B) should not be construed as being all inclusive.

OSH

**CHRYSLER CORPORATION**
**MANUFACTURING TECHNICAL INSTRUCTIONS**

SUBJECT:   INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON
PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS
MATERIAL

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|------------|----------------|-------------|------------|-------|
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 15 OF 18 |

Appendix B (continued)

*Note: Report coded maaterials in these groups when using Manufacturing Technical Instruction SMI-103 for reporting use of hazardous substances listed in SMI-102.

POTENTIALLY HAZARDOUS NON-PRODUCTION MATERIALS
Non-Production Commodity Codes

| Major Group | Intermediates |
|-------------|---------------|
| 68 Power Transmission Materials | 180 |
| 73 Refactory and Foundry Supplies | 170, 176, 500, 510, 520, 525, 540, 550, 600, 700, 750, 751 |
| 78 Fire Protection and Emergency Equipment | 085 |
| 82 Stationery Reproduction Supplies | 400, 401, 500, 605, 622, 869, 870, 871, 895, 900, 909, 915, 925, 970 |
| 85 Stationery Office Supplies | 003, 004, 005, 013, 147, 140, 160, 240, 400, 475, 500, 528, 530, 568, 855, 909, 997 |
| 97 Transportation Vehicle Repair Parts (outside) | 155, 157, 205 |
| 98 Welding Accessories and Supplies | 121, 123, 130, 135, 145, 147, 150, 155, 158, 160, 165, 170, 250, 370, 400, 405, 407, 410, 415, 417, 420, 450, 555 |

This list (Appendix B) should not be construed as being all inclusive.

OSH

# CHRYSLER CORPORATION
## MANUFACTURING TECHNICAL INSTRUCTIONS

**SUBJECT:** INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON-PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 16 OF 18 |

Appendix D

## NON-PRODUCTION MATERIALS
### RESTRICTED MAJOR GROUPS

| NPM Commodity Codes | Description |
|---|---|
| 02 All | Abrasives |
| 06 All | Belts and Belting |
| 12 All | Chemicals & Compounds; Acids; Cleaners; Gases; Polishes |
| 29 - 300, 302, 304, 306, 310, 312, 314, 316, 318, 320, 322, 324 | Filters |
| 31 All | Fuels |
| 35 - 260, 392, 525, 526, 527, 528, 529, 530, 531, 532, 533, 534, 535, 536, 537, 540, 545, 548, 580, 692, 854, 875, 876, 880, 895 | Hardware |
| 37 All | Hospital and medical supplies |
| 47 All | Lubricants and Coolants |
| 51 - 285 - 765 | Lumber; Building and Construction Materials |
| 65 All | Paint and Paint Ingredients |
| 78 All | Safety Materials and Protective Clothing |
| 98 - 121, 123, 130, 135, 140, 147, 150, 155, 153, 158, 159, 160, 165, 170, 250, 370, 400, 405, 407, 410, 415, 417, 420, 450, 455, 555 | Welding accessories, supplies, and repair parts |

This list (Appendix D) should not be construed as being all inclusive.

OSH

## MANUFACTURING TECHNICAL INSTRUCTIONS

| SUBJECT: | INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL | | | |
|---|---|---|---|---|
| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 17 OF 18 |

### Appendix E

### STATUTES

Materials used at or specified by Chrysler shall be used in such a manner as to comply with the following and all appropriate laws and regulations ensuing there from:

#### U.S.A.

Occupational Safety and Health Act

Toxic Substance Control Act

Resource Conservation and Recovery Act

Hazardous Materials Transportation Act

Clean Air Act

Federal Water Pollution Control Act

Safe Drinking Water Act

Consumer Product Safety Act

Poison Prevention Packaging Act

Federal Hazardous Substance Act

Comprehensive Environmental Response Compensation and Liability Act

Federal Insecticide, Fungicide, and Rodenticide Act

Superfund Amendments and Re-Authorization Act of 1986

Clean Air Act Amendment of 1990

OSH

### CHRYSLER CORPORATION
### MANUFACTURING TECHNICAL INSTRUCTIONS

**SUBJECT:** INSTRUCT. FOR THE APPLICATION & REQUESTING OF NON-PRODUCTIONS HAZARDOUS AND POTENTIALLY HAZARDOUS MATERIAL

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 04-01-95 | 12-1-87 | SMI-102 | 03-15-94 | 18 OF 18 |

Appendix E (continued)

CANADA

Hazardous Products Act

Transportation of Dangerous Goods Act

Environmental  Protection Act

Ontario Occupational Health and Safety Act

This list (Appendix E) should not be construed as being all inclusive.

OSH

cc: 1102



### CHRYSLER MOTORS
## MANUFACTURING TECHNICAL INSTRUCTION

SUBJECT: INDUSTRIAL HYGIENE -
CONSIDERATIONS FOR MANUFACTURING PROCESSES

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 2-15-88 | 2-15-88 | SMI-108 | SB-47 (8-15-67) | 1 of 5 |

I. **PURPOSE**

To provide instructions for examining and evaluating the need for supplemental facilities and/or equipment required for the protection of employee safety, health and well being when establishing manufacturing methods and processes.

**REFERENCE**

Plant Engineering & Environmental Planning Office Procedure No. 1-102
Corporate Policy No. 13-1, Employee Safety
Corporate Procedure No. 115
Corporate Procedure No. 164
Corporate Procedure No. 200A
Manufacturing Technical Instruction SMI-102
Federal and State Occupational Safety and Health Acts

II. **FUNCTIONS AFFECTED**

Manufacturing Engineering
Production Engineering
Facilities Engineering
Industrial Hygiene
Employee Safety
Security and Fire Prevention Services

III. **OPERATIONS AFFECTED**

Chrysler Motors and Subsidiaries

IV. **DEFINITIONS**

Comfort Zone (Average)
The range of effective temperature over which the majority (50 percent or more) of adults feel comfortable.

Dust
Small airborne solid particles created when large particles are broken up by processes such as crushing, grinding, drilling, sawing, cutting, tumbling, etc. Small particles already in existence in a mixture of materials may escape into the air as dust through such operations as shoveling, conveying, screening, sweeping, etc.

Fumes
Small solid particles formed by the condensation of vapors from heated metals that have cooled in air to become solid again. Welding is a common source of fumes.

OSH

CHRYSLER MOTORS

## MANUFACTURING TECHNICAL INSTRUCTION

| SUBJECT: | INDUSTRIAL HYGIENE - CONSIDERATIONS FOR MANUFACTURING PROCESSES | | | |
|---|---|---|---|---|
| ISSUE DATE 2-15-88 | EFFECTIVE DATE 2-15-88 | SERIES & NO. SMI-108 | SUPERSEDES SB-47 (8-15-67) | SHEET 2 of 5 |

IV.   DEFINITIONS (cont.)

Gas
The physical state of a substance which has no shape or volume of its own and tends to occupy an entire space uniformly at ordinary temperatures and pressures.

Hazardous Materials
Hazardous and/or restricted materials are those which, by reason of their chemical and physical properties, may cause impaired health or well being to persons exposed.  Current listings of these materials are covered by M.T.I. SMI-102, Appendix "A", "B", and "C".

Mists
Small airborne droplets of material that are ordinarily liquid at normal temperature and pressure.

Vapor
The gaseous form of substances which is normally in the solid or liquid state and which can be changed to these states either by increasing the pressure or decreasing the temperature.

V.   INFORMATION

A.   General

It is Chrysler Motors policy to ensure that every employee has a safe and healthful work environment.  Prevention of occupational illness and injury take precedence in the conduct of business.

When Production Engineering establishes the manufacturing process and selects the machinery and/or equipment for that process, they shall apply supplemental facilities and/or equipment required to protect employees from materials used in or emitted by the process.  This includes protection from excessive noise as well.  Further, Corporate Procedure 200A requires that the implementation of OSHA regulations shall be considered "...in all tooling and facility decisions which are made".

It is the practice within Chrysler Motors for Production Engineering, when establishing the process, to work closely with Facilities Engineering, Plant Industrial Hygiene and Safety management to establish the associated building facilities required for the manufacturing equipment; however, many requirements will not be apparent until engineering for the equipment has been completed.  Operations such as welding, painting, heat treating, etc. will be recognized by the Facilities Engineering as requiring environmental control.

However, coolant mist and noise generated by machining operations, for example, may not be obvious to the Facilities Engineers unless it is called to their attention by Production Engineering, Plant Safety, and/or Industrial Hygiene management.

OSH

cc: 1102

# CHRYSLER MOTORS
## MANUFACTURING TECHNICAL INSTRUCTION



SUBJECT:  **INDUSTRIAL HYGIENE -**
**CONSIDERATIONS FOR MANUFACTURING PROCESSES**

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 2-15-88 | 2-15-88 | SMI-108 | SB-47 (8-15-67) | 3 of 5 |

V.    A.   (cont.)

This M.T.I. requires early review of manufacturing processes while still in design stages to identify those which may require supplemental facilities for the control of noise, hazardous materials, and/or other potential employee health related issues.

Industrial Hygiene and Safety management are required to be a part of the planning process and shall be consulted early in the design stages for recommendations regarding control of hazardous materials, noise and other potential health related issues.

VI.    INSTRUCTIONS

A.   Application

Control methods shall be chosen for their effectiveness, dependability and adaptability to the operation and shall take into consideration initial cost, minimum maintenance and low operating costs.

Elements of control generally fall into the following categories:

1.   Environmental

a.   Ventilation

The quality, quantity and distribution of air in occupied spaces are more directly associated with worker health, comfort and general well being than most other environmental factors.  Good ventilation assures protection of employees from exposure to hazardous airborne contaminants and provides comfort as well.

The application of local exhaust ventilation has been accepted as a preferred method for controlling and collecting hazardous airborne contaminants.  This method of control removes contaminants at their source while the lower volume of air required for control (compared with general or dilution ventilation) results in lower heating costs.

It is also necessary to complement exhaust ventilation with tempered fresh air make-up systems.  Properly designed and installed, both local exhaust and fresh air make-up will provide personal comfort as well as a safe, controlled work room atmosphere. The Occupational Safety and Health Bulletin No. IH-11 should be referred to for additional information on make-up air.

The function initiating a project or order for a new process and/or machinery shall be responsible for alerting appropriate personnel to those features in the process or machinery which warrant a study for ventilation requirements.

OSH

cc: 1102

# CHRYSLER MOTORS
## MANUFACTURING TECHNICAL INSTRUCTION

| | INDUSTRIAL HYGIENE - | | | |
|---|---|---|---|---|
| SUBJECT: | CONSIDERATIONS FOR MANUFACTURING PROCESSES | | | |

| ISSUE DATE | EFFECTIVE DATE | SERIES & NO. | SUPERSEDES | SHEET |
|---|---|---|---|---|
| 2-15-88 | 2-15-88 | SMI-108 | SB-47 (8-15-67) | 4 of 5 |

VI.   A.   1.

b.   Airborne Contaminants

Before ventilation can be implemented in a control program, some knowledge regarding the concentration and nature of airborne contaminants is needed. Information on hazardous and/or restricted materials and their permissible exposure limits is available to the Facilities Engineer through the Industrial Hygiene and Safety Departments.

Consultation with Industrial Hygiene personnel regarding the contaminants to be controlled will also be helpful in determining whether general, dilution, or local ventilation is applicable.

2.   Manufacturing Materials

a.   The purchase, distribution and use of hazardous and/or restricted materials is under strict control within the corporation and must follow the dictates of the OSHA Hazard Communication Standard as well as the Corporate Hazard Communication Program, Occupational Safety and Health Bulletin No. 7, Corporate Procedure No. 115, M.T.I. SMI-102, and Procurement Procedure No. 65-11.

The function initiating the project, work order, etc., has the responsibility of specifying the manufacturing materials and supplies, unless the process is covered by a P.S. (Process Standard) issued by the Product Engineering Division.

The Industrial Hygiene Department develops, maintains and distributes the hazardous material list. This list is distributed to Production Engineering, Safety, Purchasing, Plant Engineering, Security and Fire Prevention Services, Industrial Engineering and responsible Group and Corporate staffs.

When a hazardous material is specified for the manufacturing process, the specifying activity shall obtain written authority for use from Industrial Hygiene and Safety on "A Request for Test - Nonproduction Material/Services", Form #84-261-7840.

b.   Testing Control

Testing of hazardous materials for specific application in addition to specific Industrial Hygiene and Safety management approval shall be handled in accordance with the standard practice established by Corporate Procedure No. 115, "Testing Non-Production Material to Establish Approved Items."

OSH

| cc: 1102 | **CHRYSLER MOTORS**<br>**MANUFACTURING TECHNICAL INSTRUCTION** |  |
|---|---|---|

| SUBJECT: | **INDUSTRIAL HYGIENE -**<br>**CONSIDERATIONS FOR MANUFACTURING PROCESSES** | | | |
|---|---|---|---|---|

| ISSUE DATE<br>2-15-88 | EFFECTIVE DATE<br>2-15-88 | SERIES & NO.<br>SMI-108 | SUPERSEDES<br>SB-47 (8-15-67) | SHEET<br>5 of 5 |
|---|---|---|---|---|

VI.   A.   2.

      c.   Manufacturing Materials - Other.

During planning and development of a manufacturing process, if it is determined there is a health problem, Industrial Hygiene and Safety management shall be consulted to assist in establishment of engineering or program controls.

When requesting materials of a chemical nature or materials that can affect an employee's health, the initiating activity shall obtain written approval from Industrial Hygiene and Safety management.

NOTE: Approval of the materials shall be for the initial process and similar use. Application of the material to dissimilar processes or uses shall require separate approval.

VII.   **GENERAL**

Engineering supplemental facilities and equipment for employee health, safety and comfort into manufacturing operations can best be accomplished during design stages of the new operation.

The initiating function shall be aware of the potential health and safety hazards that may be encountered when machinery or operational equipment are specified. Consultation is required with responsible engineering functions and Industrial Hygiene and Safety management to determine the most feasible manufacturing environmental controls for effective employee protection.

OSH

**BULLETIN**

 **CHRYSLER MOTORS**

# OCCUPATIONAL SAFETY AND HEALTH

BULLETIN NO. IH 9

Date: SEPTEMBER 30, 1987

TO:  ASSEMBLY PLANT MANAGERS

Subject: BENZENE OSHA STANDARD

On September 11, 1987, OSHA published its final rule regarding Occupational Exposure to Benzene which becomes effective December 10, 1987.  The new standard lowers the OSHA Permissible Limit for benzene - from 10 parts per million (ppm) to 1 ppm.  The new rule also contains specific requirements governing environmental monitoring, methods of compliance, respiratory protection, medical surveillance, etc.  At this time the only known operations within Chrysler that have a potential for elevated exposure to benzene are the gasoline fill work stations in assembly plants.

Chrysler assembly plants other than Jeep/Eagle have been equipped with low-volume, high-velocity (LVHV) exhaust systems which significantly reduce employee exposure to benzene.  Within 30 days please check each production gasoline filling operation assembly plant to assure that LVHV ventilation is in place and operational. Jeep/Eagle locations are not equipped with this type of ventilation and should conduct sampling immediately to identify existing exposure and based on sampling results submit projects to install LVHV ventilation for production gasoline filling operations.

All affected plants are required to have initial monitoring completed before February 10, 1988.

Please respond with the status of existing ventilation equipment as well as the status of projects for control before November 1, 1987.

G. A. Sattelmeier
Manager, Industrial Hygiene

Attachment

Distribution to:
Manufacturing Eng. Managers
Personnel Managers
Safety Administrators
Plant Physicians
Occupational Health Nurses

cc: R. E. Acosta          R. T. Donaldson      W. H. Neumann
    R. J. Brandt, M. D.   C. H. Eschenbach     D. E. Pentecost
    T. R. Breneiser       T. Gallagher         R. W. Rawlings
    J. A. Carlson         P. R. Gilezan        R. D. Ruggiero
    J. B. Carson, Jr.     S. B. Hantler        J. A. Savage
    G. Chomakos           P. A. Horgan, R. N.  A. F. Scudder
    R. E. Dauch           J. E. Lodge          A. R. Stuart
    D. R. Dolenga         T. Majchrzak         B. D. Trimpe

O C C U P A T I O N A L   S A F E T Y   A N D   H E A L T H



OSH

ROOF

4" ⌀

MASTER EXHAUST FAN
SPARK AND EXPLOSION PROOF,
CLASS I, GROUP D
MDL. NO. (TO FOLLOW)

NON FERROUS DUCT
(TYPICAL)

4" ⌀

Y CONNECTION AT 7' LEVEL
(ABOVE FLOOR)

1¼⌀ HOSE

EXHAUST DETAIL

2½⌀ I.D. WIRE REINFORCED HOSE

COPPER PIPE

GASOLINE NOZZLE

PLASTIC
END PIECE

SECURE WITH TAPE
TO SUIT

NOZZLE DETAIL

1¼⌀ I.D. HOSE FOR
EXHAUST

ALE

FACILITIES ENGINEER,
STMP'G. & ASS'T. DIV.





LEXSEE 2008 U.S. DIST. LEXIS 18845

**CARETOLIVE, Plaintiff, v. ANDREW von ESCHENBACH, et al., Defendants.**

**Case No. 2:07-cv-729**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2008 U.S. Dist. LEXIS 18845*

**February 26, 2008, Filed**

**PRIOR HISTORY:** *CareToLive v. Von Eschenbach, 2008 U.S. Dist. LEXIS 8952 (S.D. Ohio, Jan. 22, 2008)*

**COUNSEL:** [*1] For CareToLive, a not for profit corporation c/o Statutory Agent, John Doe, a late stage prostate cancer Patient who resides in Ohio, c/o CareToLive, Plaintiffs: Kerry M Donahue, LEAD ATTORNEY, Bellinger & Donahue - 2, Dublin, OH.

For Andrew von Eschenbach, official capacity as Commissioner Food and Drug Administration, Mike Leavitt, in his capacity as Secretary of the U.S. Department of Health and Human Services, United States Of America, Richard Pazdur, M.D., United States Of America, Howard Scher, M.D., Defendants: Mark Thomas D'Alessandro, LEAD ATTORNEY, United States Attorney's Office - 2, Columbus, OH; Andrew Clark, Office of Consumer Litigation, U.S. Department of Justice, Washington, DC; Daniel K Crane-Hirsch, Office of Consumer Litigation, United States Department of Justice, Washington, DC; John J Stark, US Attorney Office, Columbus, OH.

**JUDGES:** GREGORY L. FROST, UNITED STATES DISTRICT JUDGE. Magistrate Judge Norah McCann King.

**OPINION BY:** GREGORY L. FROST

**OPINION**

**OPINION AND ORDER**

This matter came on for consideration of the unopposed Motion of Non-Party Paul Goldberg for Sanctions Against Plaintiff CareToLive, Pursuant to Civil *Rule 45(c)(1)* ("Goldberg's Motion for Sanctions"). (Doc. # 66.) For the reasons [*2] that follow, the Court **GRANTS IN PART and DENIES IN PART** that motion.

**I. Background**

Non-party Goldberg is an award-winning journalist who, with his wife Kristen Goldberg, edits and publishes *The Cancer Letter.* On August 2, 2007 the Goldbergs, who live in Washington, D.C., received by facsimile two subpoenas [1] issued by Plaintiff in the instant action, seeking certain confidential source materials, and a physical inspection of their home offices by Plaintiff's counsel, Kerry Donahue.

>    1   All of the documents referred to herein are filed as exhibits to Goldberg's Motion for Sanctions. (Doc. # 66.)

On August 3, 2007 Donahue emailed Goldberg informing him that Donahue intended to have the subpoenas hand served and that "if we do not resolve the issue very soon then I shall make flight reservations and shall be at your office at 10:30 a.m. on August 13, 2007." Donahue further stated that he would bring a computer



**EXHIBIT**

tabbies®

F

2008 U.S. Dist. LEXIS 18845, *2

expert with him.

On August 5, 2007 Goldberg and his wife left Washington D.C. on a long-planned vacation, *(i.e., the vacation had been planned long before Goldberg received the subpoenas at issue here).* Later that same day, a process server attempted to serve Goldberg at his home but was [*3] informed by Goldberg's seventeen year old daughter that he was on vacation.

On August 5, 2007 Donahue sent an email to Goldberg asking "why are you fighting this so hard" and indicating again that he was coming "to search your business" on August 13, 2007 and that "there will be cameras there." Donahue sent a second email that day, accusing Goldberg of having his daughter lie for him and threatening that the process server would be "knocking on your door all night."

On August 6, 2007, the first business day after Plaintiff attempted to serve the subpoenas, *The Cancer Letter's* counsel, Steven Lieberman, wrote to Donahue informing him, *inter alia,* that the Goldbergs were away on vacation and after they returned the parties could discuss accepting service. In response, Donahue left a voice mail message with Lieberman admitting that Goldberg had not yet been properly served and accused Goldberg of "hiding out in his basement trying to avoid federal subpoenas." Donahue also again threatened [2] that he would be in Washington D.C. on August 13, 2007 and that "there will be a lot of press people right behind me."

> 2 Goldberg contends that the threats to appear at his home on August 13, 2007 were [*4] of particular concern because his daughter was home alone and Donahue had previously been convicted of criminal trespass, a conviction that was upheld on appeal.

On August 8, 2007 Plaintiff filed a 22 page document titled "Petition to Enforce Subpoena" in the United States District Court for the District of Columbia. Plaintiff requested that court to enforce the subpoenas at issue here.

On August 10, 2007 Goldberg's counsel responded to Donahue's voicemail message indicating, again, that the Goldbergs were out of town on vacation. Lieberman also suggested that Donahue familiarize himself and comply with *Fed. R. Civ. P. 45* because the subpoenas were facially invalid. Further, Lieberman indicated that

Donahue's postings to the internet suggested that the subpoenas were simply a publicity stunt and that he "may wish to consider the effect of *Fed. R. Civ. P. 45(c)(1)*." Finally, he indicated that if the Clerk in the District of Columbia accepted his Petition to Enforce Subpoena "and we are required to prepare a response, we will seek attorneys' fees on behalf of the Goldbergs and *The Cancer Letter.*" In response, Donahue sent an email indicating that if he did not get the information requested [*5] in the subpoenas, he could "depose [Goldberg] and subpoena him to all the hearings" and that Goldberg was "going to force us to make him a party to this litigation."

On August 10, 2007 the Goldbergs and *The Cancer Letter* served Donahue with *Rule 45* objections.

On August 14, 2007 Donahue sent Lieberman an email claiming that because Goldberg and *The Cancer Letter* had been so uncooperative, he had "decided I need to take both their depositions" and after that "we shall decide whether to amend our complaint to add them as Defendants." In another email sent that same day, Donahue indicated that he considered Goldberg and *The Cancer Letter* to be in contempt of court and opined that because "the subpoena requested documents to be produced in Ohio. Mr. Goldberg would need to appear in Ohio to show cause."

On August 22, 2007 Goldberg and *The Cancer Letter* opposed Plaintiff's Petition to Enforce Subpoenas. On November 5, 2007 the District of Columbia District Court issued an Order denying Plaintiff's Petition to Enforce Subpoena because the subpoenas were "facially invalid." Further, that court indicated that Plaintiff's conduct was "sanctionable," citing to *Fed. R. Civ. P. 45(c)(1)*, which the [*6] court explained "provides that the Court on behalf of which the subpoena was issued shall impose the appropriate sanction, which may include reasonable attorneys' fees." Moreover, the Court specifically stated that the "denial is without prejudice to any motion for sanctions that Goldberg may file in Ohio."

On November 26, 2007 non-party Paul Goldberg filed Goldberg's Motion for Sanctions. (Doc. # 66.) This Court scheduled a non-oral hearing on January 18, 2008 for that motion. (Doc. # 67).

On January 22, 2008 this Court issued an Opinion and Order which granted Defendants summary judgment in this case. (Doc. # 69) (that decision in currently on appeal before the Sixth Circuit). In that Opinion and

Order the Court specifically informed the parties that it would retain jurisdiction to decide Goldberg's Motion for Sanctions. *Id.* at 28 ( "the Court retains jurisdiction over the pending motion for sanctions"). *See also Phelan v. Bell, 8 F.3d 369, 372 (6th Cir. 1993)* (explaining that the United States Court of Appeals for the Sixth Circuit has consistently held that the trial court is in the best position to decide certain collateral matters such as sanctions, attorneys' fees and costs, even [*7] while divested of jurisdiction over the substantive matters in a case).

Plaintiff failed to respond to Goldberg's Motion for Sanctions. On January 16, 2008 Plaintiff filed a motion to dismiss Goldberg's motion for lack of jurisdiction. (Doc. # 73.) This Court denied that motion on January 22, 2008. (Doc. # 74.) In its Opinion and Order, the Court indicated that it had unequivocally retained jurisdiction to decide Goldberg's Motion for Sanctions. *Id.* at 1. Further, the Court articulated that the motion remained unopposed by Plaintiff and that Plaintiff had "submit[ed] no reason why this Court should extend the deadline date [to respond] which has already passed." *Id.* at 2. Plaintiff has not filed anything since the issuance of that Opinion and Order.

## II. Standard

Goldberg moves for sanctions under *Fed. R. Civ. P. 45(c)(1)*, which provides:

> (c) Protecting a Person Subject to a Subpoena.
>
> (1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction--which may [*8] include lost earnings and reasonable attorney's fees--on a party or attorney who fails to comply.

According to the 1991 Advisory Committee Notes, *Rule 45*'s sanctions provision was intended primarily to protect "a non-party witness as a result of a misuse of the subpoena." *Fed. R. Civ. P. 45(c)(1)* advisory committee's note (1991).

## III. Analysis

*Rule 45* makes clear the obligation of parties to respect the rights of third parties and that a party should avoid using the subpoena process to impose undue burden or expense. *Fed. R. Civ. P. 45(c)(1)*. Goldberg argues, and this Court agrees, that Donahue has completely disregarded this obligation throughout his interactions with Lieberman, the Goldbergs, and *The Cancer Letter*. Therefore, the imposition of sanctions against Donahue is appropriate.

First, as the United States District Court for the District of Columbia held, the subpoenas at issue here are "facially invalid" since they were not issued from that court. Further, as Donahue admits, the Goldbergs were not properly served. As a court in the Seventh Circuit observed: "When a subpoena should not have been issued, literally everything done in response to it constitutes 'undue burden or expense' [*9] within the meaning of Civil *Rule 45(c)(1)*." *Builders Ass'n of Greater Chicago v. City of Chicago, Case No. 96 C 1122, 2002 U.S. Dist. LEXIS 8461, 2002 WL 1008455, at *4 (N.D. Ill. May 13, 2002)*. There can be little dispute then that the subpoenas here imposed an undue burden on Goldberg. *See also Cincinnati Ins. Co. v. Cochran, 198 Fed. Appx. 831, 832 (11th Cir. 2006)* (same) and *Molefi v. Oppenheimer Trust, Case No. 03 CV 5631 (FB) (VVP), 2007 U.S. Dist. LEXIS 10554, (E.D.N.Y. February 15, 2007)* (same).

Second, this lawsuit was only filed on July 30, 2007. Because the lawsuit was filed against the government, the answer was not due for 45 days. Pursuant to *Fed. R. Civ. P. 26(d)*, Plaintiff was barred from taking discovery until after the *Fed. R. Civ. P. 26(f)* conference was held. Yet, Plaintiff faxed the subpoenas at issue here just three days after filing this action.

Thus, the Court concludes that because of Donahue's unreasonable conduct, Goldberg was forced to incur expenses in responding and corresponding with regard to these invalid subpoenas. Moreover, Donahue was informed on several occasions as to the invalidity of the subpoenas, but failed to correct them. Indeed, Lieberman specifically informed Donahue [*10] that his behavior was sanctionable and that if Donahue failed to cease his unreasonable behavior Goldberg would seek sanctions under *Fed. R. Civ. P. 45(c)(1)*-which he has done here.

Moreover, it is clear that at least some of Donahue's

behavior was meant to harass. Donahue admits this on his website where he posts his comments about the Goldbergs (that they "left town to avoid service" of the subpoenas and that their daughter lied about them hiding), stating that this litigation "is going to be expensive and needs to be funded" and his hope that some "excitement may encourage people to put some money up."

This Court has no hesitation concluding that Donahue's conduct is sanctionable under *Fed. R. Civ. P. 45(c)(1)*. The only issue is the amount of the sanctions. Goldberg contends that his expenses totaled $ 12,2000. However, Goldberg failed to itemize in any way the costs.

Courts imposing a sanction of attorneys' fees under *Rule 45(c)(1)* have often granted sanctions equaling most if not all of the attorneys' fees sought. *See, e.g., Am. Int'l Life Assur. Co. v. Vasquez, Case No. 02 Civ. 141 (HB), 2003 U.S. Dist. LEXIS 2680, 2003 WL 548736, at *3 (S.D.N.Y. Feb. 25, 2003)* (concluding that a sanction in the amount of [*11] $ 4,436.00, representing "much of" the subpoenaed individual's fees and costs, was appropriate where the subpoena was improperly issued and the issuing party refused to withdraw it); *Liberty Mutual Ins. Co. v. Diamante, 194 F.R.D. 20, 23 (D. Mass. 2000* (same); *Batture Fleet, Inc. v. Browner, Case No. 00 Civ. 205, 2000 U.S. Dist. LEXIS 8309, 2000 WL 748093, at *2 (E.D. La. Jan. 8, 2000)* (same).

In determining the reasonable hourly rate for attorneys' services, district courts should look to the prevailing market rates "for comparable attorneys of comparable skill and standing in the pertinent legal community." *Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 172 (2d Cir. 1998)*. Where as here, no information is provided concerning the itemization of the attorneys' fees, it is appropriate to reduce the amount of a fee award sought. *See, e.g., S.W. ex rel. N.W. v. Bd. of Educ. of the City of New York (Dist. Two), 257 F. Supp.2d 600, 607-08 (S.D.N.Y. 2003)*; *General Motors Corp. v. Villa Marin Chevrolet, Inc., 240 F. Supp.2d 182, 188 (E.D.N.Y. 2002)*. Accordingly, the sanction imposed here is reduced from the amount sought by Goldberg to $ 6000.00.

**IV. Conclusion**

Based on the foregoing, the Court **GRANTS IN PART and DENIES IN** [*12] **PART** Goldberg's Motion for Sanctions. (Doc. # 66.) Specifically, Goldberg is awarded $ 6000.00 from Plaintiff and a judgment against Plaintiff is entered in that amount.

**IT IS SO ORDERED.**

/s/ **Gregory L. Frost**

**GREGORY L. FROST**

**UNITED STATES DISTRICT JUDGE**





LEXSEE 2006 U.S. DIST. LEXIS 58293

**WILLIAM C. FLAX, Plaintiff, v. STATE OF DELAWARE, Defendant.**

**Civil Action No. 03-922-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 58293*

**August 18, 2006, Decided**

**SUBSEQUENT HISTORY:** Motion denied by *Flax v. Delaware, 2007 U.S. Dist. LEXIS 33446 (D. Del., Apr. 19, 2007)*

**COUNSEL:** [*1] William C. Flax, Plaintiff, Pro se, Wilmington, DE.

For State of Delaware, Defendant: Marc P. Niedzielski, Department of Justice, Wilmington, DE.

**JUDGES:** KENT A. JORDAN, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KENT A. JORDAN

**OPINION**

**MEMORANDUM ORDER**

**I. Introduction**

Plaintiff William C. Flax ("Flax"), who proceeds *pro se,* filed this action alleging employment discrimination pursuant to *42 U.S.C. §§ 1981a, 12203(a), 12112, 2000e-5; 29 U.S.C. §§ 158, 791;* and, *15 U.S.C. §§ 1673-1677.* (D.I. 73.) More particularly, Flax alleges race discrimination and violations of the Americans with Disabilities Act ("ADA"). Discovery issues have plagued this case from its inception. This Order is an effort to resolve the continuing discovery issues. Going forward,

no further discovery shall take place.

**II. Allegations of Complaint**

The complaint as amended alleges that Flax was employed by the State of Delaware ("the State") as a Master Family Service Specialist (social worker). (D.I. 2, 73.) He was involved in a work related auto accident in February 2001 and was off work for over a year. (D.I. 2.) In March [*2] 2002 Flax was released to return to work with restrictions, and he alleges the State refused to allow him to return to his former position with reasonable accommodations as ordered by his physician. (*Id.*) Flax alleges he was removed from the State's payroll on May 31, 2002, because he had been off work for over one year. (*Id.*)

Flax then filed a claim to determine his workers compensation benefits seeking to recover total disability benefits. The Delaware Supreme Court affirmed the lower courts' decisions and held that the evidence did not support a conclusion that Flax was totally disabled during the claimed period. *Flax v. Delaware, No. 450, 2003, 852 A.2d 908, 2004 WL 1535816 (Del. 2004).*

He applied for Social Security disability in June 2002, and the State allowed Flax to return to work on a special project for a two month period so that he could qualify for a state pension. (D.I. 2.) Flax was awarded Social Security disability benefits in July 2002 and he retired from his state position in September 2002. (*Id.*)



**EXHIBIT**

G

tabbies

Flax alleges that he was discriminated against on the bases of race, age, and disability, when he was denied reinstatement to his former [*3] position. (*Id.*) He also alleges that a white employee received an accommodation when she became disabled, that he believes he was replaced with a younger social worker, and that he was discriminated against in retaliation for filing a union grievance over salary issues based upon discrimination. (*Id.*)

Flax seeks injunctive relief, back pay, lost benefits and wages, compensatory and liquidated damages, benefits from workers' compensation, settlement and adjustment of any collateral claims of withholdings made upon his salary while he was off work, and front pay in lieu of forced disability retirement. (D.I. 73.)

### III. Procedural and Factual Background

Flax filed his original complaint on October 1, 2003. (D.I. 2.) He was granted leave to proceed *in forma pauperis* and service was effected upon the State. (D.I. 4-6.) On August 30, 2004, a scheduling order was entered setting a discovery cutoff date of August 1, 2005. (D.I. 21.) Also, a trial management order was entered. (D.I. 22.) Flax and the State filed their initial disclosures and a few days later Flax served a subpoena upon the Division of Family Services' ("DFS") personnel manager and he also filed a request [*4] for admissions. (D.I. 24, 25, 27, 28.) One week later, on September 17, 2004, Flax filed a motion for the court to approve or consider his request for inspection of his former employer's premises. (D.I. 28.) The State opposed the motion, arguing that Flax was merely unhappy with the State's response to his subpoena, which the State construed as a request for production of documents. (D.I. 29.) The State opposed any order to allow Flax to personally enter the offices of DFS to gather documents.

Next, Flax served subpoenas for records upon the executive director of the AFSCME [1] Council 81, upon the insurance coverage office for the State, and upon the Pennsylvania Manufacturer Association Insurance Company ("PMA"). (D.I. 31, 32, 33.)

> 1   The complete name of the union is the American Federation of State, County and Municipal Employees. http://www.afscme.org

On October 15, 2004, the State responded to Flax's first request for production of documents and request for admissions (D.I. 34, 35.) Documents provided included [*5] an affirmative action/managing diversity plan July 2002 - June 2003; June 2, 2004 Flax letter; June 5, 2002 Susan McNamara memorandum; master family services specialist job description; June 3, 2002 AFSCME grievance form; Delaware Department of Labor referee's decision mailed July 26, 2002; January 22, 2003 Bill Southam letter; September 30, 2002 application for pension; 2001, 2002, 2003 earnings for Flax; 2001 leave balance; June 29, 2004 decision by the Supreme Court for the State of Delaware in *Flax v. Delaware*, No. 450, 2003, 2004 Del. LEXIS 279; July 10, 2003 EEOC dismissal and notice of rights; response to Flax's charge of discrimination; October 18, 2002 State of Delaware Industrial Accident Board decision; Flax's personnel records; Flax's charge of discrimination, Charge No. 170A300336; decision of the Superior Court of Delaware, *Flax v. Delaware*, No. C.A. 02A-11-002-FSG, 2003 Del. Super. LEXIS 281; 2001 salary schedule for Flax; October 12, 2000 Jesse Langston memorandum; and wage attachment and garnishment records.

Flax filed a memorandum dated October 22, 2004, memorializing his conversation with the State's counsel regarding discovery concerns and indicating that he was in need of an "Employees Handbook, and [*6] a State of Delaware Human Resources Procedural Manual." (D.I. 36.) Flax then filed a motion to extend the time to supplement his pleadings, explaining that he intended to assert new claims and a new legal theory based upon the same core of facts. (D.I. 37.) The State objected to this motion, arguing that Flax had issued multiple discovery requests, including four requests for production of documents and a request for admissions. (D.I. 38.) The State indicated that the discovery was provided to Flax, along with a copy of his entire personnel file. (*Id.*) Flax replied arguing that he believed there was new evidence regarding the State's interpretation of its "affirmative action, employment, and protected class guidelines that may have mislead the EEOC." (D.I. 38, 39, 41.) Flax requested that he have access to and inspect his original personnel file under controlled supervision. (D.I. 39.) He also indicated that the following evidence would support his claim: nonconfidential statistics, a routinely developed seniority list, list of office of child services personnel and vacancies, routine calculations of personnel assigned, transferred, and promoted within the division. (*Id.*) The [*7] State responded, and again objected to an amendment, noting that it had produced Flax's personnel file. (D.I. 44.) Flax filed an "answer" to

2006 U.S. Dist. LEXIS 58293, *7

the State's opposition. (D.I. 51.)

On December 8, 2004, Flax filed two motions to compel the production of documents: one directed to the Delaware Insurance Coverage Office ("DICO") and the other directed to PMA. (D.I. 45, 46.) Flax argued that DICO did not object or produce the records requested in his October 5, 2004 subpoena. (D.I. 45.) Flax subsequently withdrew the motion to compel, noting that he had received responses from DICO on December 11, 2004. (D.I. 57.)

With regard to PMA, Flax argued that it provided an incomplete production of documents and he disagreed with PMA's statement that it had "no further obligation to [his] request." (D.I. 46.) Flax further argued that PMA was "attempting to conceal significant portions of [his] coverage." (Id.) Flax had sent a follow-up letter to PMA dated March 5, 2003, but filed December 17, 2004, wherein he advised counsel for PMA that he believed there was more discovery at PMA essential for the development of his case. (D.I. 56.) PMA opposed the motion to compel, arguing that it had fully [*8] responded to Flax's subpoena duces tecum, and it sought a protective order. (D.I. 59.)

Additional information and documents were produced to Flax by the State on December 9, 2004, including Flax's DICO claim file, and a witness name at DICO. (D.I. 48.) The next day, Flax filed a memorandum to counsel for the State, again regarding discovery concerns. (D.I. 52.) Flax made the following complaints: the latest response from the State did not correspond with the categories of documents he had demanded, the State did not label any of the pages or documents submitted to him, the State ignored his set of definitions and his interpretation of instructions, there were missing and undated pages, there were untitled pages without adequate headings, he received documents "that were not correlated [as requested]," and he received an incomplete medical authorization for injured employees. (Id.) Flax requested a copy of a State human resources ("HR") procedural manual, indicating that it would affirm or refute his charges against DFS; he also sought an employee handbook and permission to have personal access to his original personnel records, as he believed was provided for in the union's [*9] labor-management agreement. (Id.) Almost immediately thereafter, Flax filed another memo to counsel for the State, dated December 14, 2004, reiterating certain aspects of his previous memorandum. (D.I. 55.)

I scheduled a teleconference for January 5, 2005, to discuss the disputed discovery issues. (D.I. 58.) In the meantime, Flax continued to correspond with counsel for the State and he advised the State of the persons he wished to depose. (D.I. 62, 63.) Flax also filed an "outline of issues" to discuss during the January 5<th> conference relative to his discovery dispute with PMA. (D.I. 64.)

The discovery telephone conference was held as scheduled. [2] I was advised that Flax no longer had any discovery disputes with the State. (1/5/05 teleconference transcript at 7-8.)

> 2   During the teleconference, Flax was also given two weeks to file an amended complaint. (D.I. 65.) He did so on January 18, 2005. (D.I. 73.)

I then heard about discovery from PMA. PMA advised that it had provided to Flax all discovery [*10] other than that considered privileged. (Id. at 13.) PMA stated that it would search for additional documents that Flax requested and, so long as the documents were not privileged, would produced them. (Id. at 20-21.) I advised Flax that, in discovery disputes, he must demonstrate how a requested document is relevant to his claim of discrimination. (Id. at 21-22.) I also suggested to Flax that he speak to counsel for PMA regarding taking the depositions of PMA employees. (Id. at 23.) Flax proceeded to subpoena for deposition two PMA employees and continued to schedule depositions for PMA employees as well as for State employees. (D.I. 67, 68, 69, 70, 74, 75, 76.) He also requested that the State employees bring all relevant documents to their deposition and review applicable policies and procedures relating to each and every one of the acts alleged to be discriminatory. (D.I. 70.)

On January 14, 2005, the State provided Flax documents from DICO in support of its policies and procedures. (D.I. 72.) On January 25, 2005, the State served its first set of interrogatories and first request for production of documents directed to Flax. (D.I. 78, 79.) Flax responded to the [*11] discovery requests on March 11, 2005. (D.I. 85, 86.) Counsel for the State wrote to Flax that his claims of privilege or confidentiality were not sufficiently identified, making it difficult to understand them or object to them. (D.I. 87.) Counsel for the State explained to Flax the procedure used when claiming a privilege. (Id.) Later that month, Flax

2006 U.S. Dist. LEXIS 58293, *11

supplemented his discovery responses. (D.I. 98, 99, 101, 102.)

On January 26, 2005, Flax filed a letter complaining that the tactics of counsel for the State had seriously and negatively affected his efforts during the taking of depositions. (D.I. 80.) Flax specifically mentioned that the attorneys instructed the "court recorder" not to go off record, and they instructed Flax not to interrupt their witnesses. (*Id.*) Flax's deposition was taken on April 6, 2005. (D.I. 105.)

On April 28, 2005, Flax served upon the State a second request for admissions. (D.I. 104.) The State filed its response on May 27, 2005 (D.I. 111, 114.) The State objected to certain requests for admission, and Flax requested a telephone hearing to resolve the dispute. (D.I. 119.) Flax served upon the State a second request for production of documents and [*12] the State responded to the request on June 8, 2005. (D.I. 114, 116.)

On May 9, 2005, I learned of a yet another discovery dispute between the parties because Flax sought to avoid paying for a copy of his deposition transcript. (D.I. 107.) Flax requested a hearing on the issue. (D.I. 108.) He also filed a copy of a local rule he believed pertinent to the issue. (D.I. 110.) A hearing was held on May 26, 2005. (D.I. 109, 112.) At that time, I endeavored to explain to Flax several discovery rules and their interplay with the court's local rules. (D.I. 112.) I advised Flax that, regardless of his *pro se* status, he was not entitled to have the State pay for or make a copy of his deposition and provide it to him. I told him that he would have to pay the court reporter if he wanted a copy of his deposition, or, since the deposition was filed, he could read the transcript and make notes.

During the hearing Flax also requested that certain discovery communications between him and the State be filed with the court. I informed the parties that they were expected to comply with the local rules regarding what should be filed. I further explained that not every communication was to be filed, [*13] but, in some instances, a communication might fit within the category set forth in Local Rule 5.4 [3].

3  Local Rule 5.4 states in pertinent part:

(a) *Service Without Filing.* Except in cases involving pro se parties, all requests for discovery

under *Fed. R. Civ. P. 31, 33 through 36,* and *45,* and answers and responses thereto, and all required disclosures under *Fed. R. Civ. P. 26(a),* shall be served upon other counsel or parties but shall not be filed with the Court. ...

(c) *Filing Where Necessary.* If depositions, interrogatories, requests for documents, requests for admissions, answers or responses are to be used at trial or are necessary to a pretrial or post trial motion, the verbatim portions thereof considered pertinent by the parties shall be filed with the Court when relied upon. ...

(f) *Notice of Filing.* When discovery materials are to be filed with the Court other than during trial, the filing party shall file the material together with a notice (1) stating, in no more than one page, the reason for the filing and (2) setting forth an itemized list of the material.

D. Del. LR 5.4.

[*14]  On June 6, 2006, Flax served a first set of interrogatories upon the State. (D.I. 113.) The State responded to the interrogatories on July 7, 2005. (D.I. 130.)

An interim case status report prepared by the State indicated that, as of June 8, 2005, Flax had conducted nine depositions, and the State had deposed Flax. (D.I. 115.) Also, the State indicated that it had produced in excess of two thousand pages of documents, and that Flax had responded to the State's discovery requests. The State indicated there was a recurring issue involving the "proper scope of discovery," particularly regarding Flax's earlier workers' compensation case. On June 13, Flax also submitted an interim status report and stated that he continued to seek from the State an "employee's manual", and that he had not received basic answers from top administrators with the State. (D.I. 118.) Flax stated that his latest request for admissions and production of the employee handbook and supervisor's HR manuals were

2006 U.S. Dist. LEXIS 58293, *14

delayed by "efforts, conclusion, and are central and significant to the case." (D.I. 118.) Flax later submitted another interim status report on July 13, 2005 in outline form. (D.I. 121.)

On June 15, 2005, I [*15] held a status conference with the parties to discuss the State's June 8<th> report and Flax's June 13<th> report. (D.I. 123.) At the outset, we discussed discovery issues. (6/15/05 teleconference transcript at 3.) The first issue addressed was Flax's requests for discovery relative to his workers' compensation case, a case that was, as earlier noted, resolved by the Delaware Supreme Court. (Id. at 3-8.) The State argued that the case before me is an employment discrimination matter, not a workers' compensation matter, and that Flax was wrongly raising disputes over workers' compensation, wages and withholdings from his salary. (Id. at 3-4.) Flax responded that he sought certain documentation because it affected his leave and qualifications for a pension. (Id. at 6-7.) He further indicated that, relative to his ADA claim, documentation from the State reflected an inconsistency in the State's treatment of employees, since he was denied an accommodation while an accommodation was made for a person who was not in a protected class. (Id. at 7-8.) I directed the parties to resolve their discovery disputes as outlined in the scheduling order of August 30, 2004. (Id. at [*16] 8-9.) I encouraged Flax to remain focused on his discrimination claim and not let his concern about the earlier workers' compensation proceeding disrupt his effort to develop his case. (Id. at 9-10.) I advised Flax that he could not use the discrimination case as a vehicle to relitigate his workers' compensation claim. (Id.)

On June 16, 2005, Flax provided the State with additional documents to assist it in responding to Flax's request for production of documents. (D.I. 124.) Also in June, the State served upon Flax a first request for admission, and Flax responded to the request. (D.I. 125, 152.) Later in the month, Flax served upon the State a third request for admissions and a second set of interrogatories. (D.I. 126, 127, 141.) The State objected to the second set of interrogatories on the basis that it had already responded to at least 51 subparts of interrogatories in Flax's first set of interrogatories, but the State did respond to the third request for admissions. (D.I. 131, 149.)

On July 8, 2005, Flax advised counsel for the State that he wanted to depose three witnesses employed by the State. (D.I. 137, 140, 143.) On the same day, Flax propounded his third set of [*17] interrogatories directed to the State. (D.I. 138.) Again, the State objected to the interrogatories on the basis that Flax had exceeded the limitation on interrogatories provided in the Local Rules. (D.I. 139.)

Flax then filed a motion for discovery sanctions on the basis that the State was engaged in discovery abuse and was impeding the discovery process. (D.I. 144.) I set a hearing on the motion. In the meantime, the State asked that the motion be stricken, arguing that it violated the scheduling order in the case and the Local Rules. (D.I. 147.) The State advised that a meeting had been held with Flax wherein Flax provided examples of documents and clarified the discovery he sought. Counsel for the State provided the clarified information to his client. The State also indicated that it had timely responded to all of Flax's discovery requests, permitted Flax to exceed the limitation on the number of depositions, and met with Flax to discuss and explain objections to discovery made by the State. (Id.)

A teleconference on Flax's sanctions motion was held on July 26, 2005. (D.I. 151.) Counsel for the State said that he had responded to all of Flax's discovery in good faith, that [*18] he was willing to meet with Flax to discuss any discovery dispute, and if there was a basis for providing certain discovery and if it existed, the requested information would be turned over. (7/26/05 teleconference transcript at 3.) Flax stated that he believed the documents he requested existed and that counsel for the State was not being responsive to his requests. (Id. at 4-5.) Flax appeared to agree that he had difficulty focusing on his claim and not seeking discovery extraneous to his claim. (Id. at 6.) I advised Flax that he had not followed the appropriate process to file a motion for discovery sanctions, and the motion to strike was granted. (Id.) I instructed the parties to discuss the discovery issues, and then follow-up with a letter to the court, if there was no resolution. (Id. at 7.) Flax also raised the issue of more time to depose witnesses. (Id. at 8.) I told Flax to let me know if he believed there was a reason he was entitled to more time than the rules provided and to discuss the issue with counsel for the State. (Id. at 9-11.)

Despite my admonition to resolve discovery disputes, issues again arose between the parties. On August 1, 2005, Flax [*19] complained that the State cut

short his deposition session of the regional administrator for DFS. (D.I. 154.) Flax also complained that he had yet to receive the employee handbook and other materials previously requested. The State agreed to provide Flax with an additional hour for the deposition and allowed Flax to tape record the deposition for his own use. (D.I. 155.)

Next, on August 31, 2005, Flax wrote to the court and complained that there were "differences with the Defendant regarding request for production." (D.I. 158.) Flax said that he learned the State was contractually obligated to comply with a labor and management agreement to provide annual documentation and that he had a dispute with defense counsel's placement of "'remarks, objections, and contact'" with witnesses before and during deposition testimony. (*Id.*) Flax requested a discovery conference and also made reference to an extension of the dispositive motion deadline. On the same day Flax filed a copy of a letter to defense counsel regarding the most recent discovery disputes. (D.I. 159.) The State objected to an extension of the dispositve motion deadline. (D.I. 163.) I set a discovery hearing to resolve the [*20] conflict. (D.I. 162.) In preparation for the telephone conference, Flax filed an outline of the discovery disputes. (D.I. 164.)

The discovery teleconference, again initiated at Flax's request, was held on September 9, 2005. (D.I. 165.) Flax complained that he had not received documents essential to his case, as set forth in his outline. (9/9/05 teleconference transcript at 3.) Specific documents included a seniority list, labor management agreement, and list print out of hired and terminated employees. (*Id.* at 4.) The State indicated that a seniority list did not exist, although such a list had been required under the prior labor management agreement. (*Id.* at 5.) Flax argued that, even if the document did not exist, the "State of Delaware must print it up." (*Id.* at 6.) Flax also stated that he wanted the document produced even if the State did not think it relevant. (*Id.*)

I asked Flax to explain why the seniority list was relevant and helpful to his case. (*Id.* at 9.) Flax replied that, based upon his seniority and qualifications, he could make a case that his employer denied him the opportunity to return to work and to continue his career with the State, because [*21] the list would show that there were persons junior to him in jobs that he could have held. (*Id.* at 9-10.) The State argued that the requested seniority

listing was irrelevant because it involved union negotiations or enforcement of a labor agreement against a state in federal court and that none of Flax's claims involve a union or union activity. (*Id.* at 10-11.) Flax responded that with the list he could have a dialogue with management in terms of where he stood if there was a possibility of a lateral transfer. (*Id.* at 11-12.)

I explained to Flax that it appeared he was confusing his rights and privileges as a union member with the rights and remedies found under Title VII. (*Id.* at 15.) I asked counsel for the State to explore the situation to determine if such a document could be generated, and if it could, to do so, merely to simplify matters. (*Id.* at 16.) I advised Flax that if such a document could not be generated he would need to present a stronger argument on the issue of the how a seniority list would lead to evidence that Flax was discriminated against on the basis of his age or race. (*Id.* at 16-17.) Counsel for the State then suggested that the parties [*22] presume, for the purposes of any pending motions, that Flax had seniority over everyone, and Flax agreed to this proposal. (*Id.* at 17.) I then held that, because it was agreed that Flax was senior to everyone, there was no need to produce the seniority list, if such a list existed. (*Id.*)

I next addressed the issue of whether Flax was required to pay for a deposition transcript as an original or as a copy. I learned that Flax had a paid for an original transcript, had the transcript in his possession, but wanted the State to reimburse him because he did not believe he should have had to pay for an original. (*Id.* at 24-25.) I determined that there would be no cost adjustment. (*Id.* at 25.)

On November 3, 2005, the scheduling order was amended and the jury trial was reset for February 6, 2006. (D.I. 176.) All other deadlines remained in effect. On November 18, 2005, Flax requested a telephone conference to discuss meeting with the State in preparation for the pretrial conference, the production of exhibits, and a possible delay in the case. (D.I. 177, 179, 180.) Hearing was held on December 1, 2005. I vacated the previously entered scheduling orders and set the matter [*23] for a status conference to be held on June 8, 2006. (D.I. 181.) The case was held in abeyance for six months. (D.I. 182.)

Prior to the June 8, 2006 status conference, Flax filed a letter on May 26, 2006, directed to the State, wherein he requested documents and documentation not received in

response to earlier discovery requests. (D.I. 183, 184.) He specifically asked for all statements and relevant information from anyone connected to him during his employment at the State's Elwyn Office; an employee handbook and HR manual dating from October 22, 2004; references "about 'missing and undated, untitled pages, as well as, "footnoted: ...every employee are required to follow a procedure (Training Manual" ...'"; applicable copies of policies and procedures and supportive documentation referred to in EEOC request for information sheet; and, a copy of the grievance/complaint provided by the State's EEOC contact person. (D.I. 184.) The State responded by arguing that the discovery period ended on August 1, 2005. (D.I. 185.) It also referred to an agreement between the parties which had been conditioned upon the State providing Flax with an additional hour to depose a witness. Finally, the [*24] State indicated that the disputes raised by Flax had already been addressed and resolved.

The status conference was held on June 8, 2006. (D.I. 186.) Flax said that the State had not supplemented its discovery as agreed. (*Id.* at 4.) He referred to deposition testimony that he said indicated he had requested discovery from the administrator [4], a supervisor's file, a grievance record for an audit regarding overpayment, payroll information for 2001, 2002, and 2003, and leave records. (*Id.* at 4-5.) Flax stated that his leave records were relevant because leave is an accommodation and that if the leave records show that leave was owed him then he should not have been removed from the payroll, and that the State violated his right to return to work through the use of his leave. (*Id.* at 6.) I then asked the parties to confer with the court's *pro se* law clerk, Ms. Nancy Rebeschini, and to advise her of their respective discovery positions. (*Id.* at 7-8.)

> 4    It is unclear what discovery Flax seeks, or whom the referenced administrator is.

[*25] After meeting with Ms. Rebeschini, the parties met with me in open court and advised me of the discovery Flax continued to request. The State agreed that it would review the discovery Flax requested, if Flax would identify with specificity what he wanted, how he had previously asked for it (i.e., whether by interrogatory or document request), whether the request was made prior to the time discovery closed, and why the State's response was inadequate. (*Id.* at 10-11.) I gave Flax one week to prepare such a response. (*Id.* at 11-12.) I advised

the State that, if the item was something reasonably requested and somehow was not provided to Flax, then the State was to give a point-by-point response regarding what was said or given to Flax. (*Id.* at 12.) I reminded Flax that the amended complaint was the relevant document as to the issues in the case. (*Id.* at 13-14.) I emphasized that the discovery process had to end at some point. (*Id.* at 15.) At the close of the hearing, Flax stated that he believed during depositions counsel for the State went beyond making proper objections. (*Id.*) I noted that, if there was a discovery problem relative to an objection, it should [*26] be specifically identified. (*Id.* at 15-16.)

One week later Flax filed a discovery request outline. (D.I. 187, 188, 190.) The outline contains twenty-two distinct discovery requests, as follows: personnel records, individual employee history cards, job announcements, eligibility lists and tests, interviewing records, personnel policies, personnel requisitions, application and selection files, personnel inventories, collective bargaining files, grievances, performance appraisals, position cuts files, disciplinary files, employee service recognitions, salary schedules, leave records, time change requests, time and attendance reports, employee pension and retirement records, personnel studies and surveys, training records, affirmative action plans, affirmative action/ADA case files, accident and safety studies and reports, unemployment compensation claims, worker's compensation claims, accident reports, insurance claims, employee medical records, and COBRA and life insurance under "waiver of premium". The filing also included a draft "agreement to protection of confidential materials," as well as a flow chart with the chronology of discovery in this case. Finally, Flax included a [*27] "statement of difficulty," making an issue of the conduct of counsel for the State during the taking of depositions, complaining of objections made, exhibits used or added, and the failure to remove certain documents.

The State responded to the filing by arguing that Flax did not follow the court's directive, that he made new discovery requests even though the time for discovery was long past, that he raised new issues with regard to the taking of depositions, that his filing was late, and that he did not attempt to resolve any discovery issues. (D.I. 189.) The State also provided a listing of all documents provided to Flax. In response to the State's objections, Flax filed a more succinct list of the information he continues to seek, the request number, date, and response or objection by the State. (D.I. 191.) Flax's last filing

requests default judgment against the State on the basis of discovery abuse and for impeding the discovery process. (D.I. 193.) Of course, the State opposes the motion. (D.I. 194.)

## IV. Discovery at Issue

This Order is intended to resolve all discovery issues in the case. I will address the concerns raised by Flax in his June 30, 2006 letter (D. [*28] I. 191), since that document provides Flax's most specific requests and responses and most easily identifies the discovery at issue.

Pursuant to *Fed.R.Civ.P. 26(b)(1)* "parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim ... of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter .... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Initially, I note that Flax continues to seek discovery that the State does not have, cannot find, is privileged, or has been produced. The State cannot produce that which does not exist or which it does not have. Nor is it required to produce documents not in its possession or under its control, nor those documents covered by privilege. Finally, the State is not required to reproduce documents previously produced. After reviewing the requests and responses as set forth in the June 30, 2006 letter, I find as follows:

## A. Plaintiff's First [*29] Request for Documents

The State's objection to Number 15 of Plaintiff's First Request for Production of Documents is well-taken. (D.I. 34.) Flax asked the State to "produce all documents that show the work histories at DFS of other employees who are qualified individuals with disabilities, as defined by the ADA." The request is overly broad, calls for a legal conclusion, and asks for private information of State employees. No adequate showing of relevance has been made to justify this sweeping and intrusive demand.

## B. Plaintiff's Second Request for Admissions

Flax's Second Request for Admission seeks admissions or denials to statements relating to Flax's long-since resolved workers' compensation case. In the

case currently pending before this court, Flax alleges that he was discriminated against on the basis of his race, and that the State failed to make a reasonable accommodation for him and retaliated against him in violation of the ADA. (D.I. 73.)

The State's objections to Second Request for Admission Numbers 1, 3, 4, 5, 7, 8, 9, and 11 are well-taken. (D.I. 111.) The current case does not rise or fall upon Flax's workers' compensation case, the calculation of benefits, [*30] deductions from his salary, the use of sick and vacation time, and the like. The current case is brought as an employment discrimination case pursuant to Title VII and the ADA. Again, no adequate showing of relevance has been made.

## C. Plaintiff's Third Request for Documents

The State has adequately responded to Request Numbers 2, 10, 13, 14, 16, 17, 20, and 21 of Plaintiff's Third Request for Production of Documents. (D.I. 114.) The court makes specific findings as to the other requests at issue.

Request Number 8 asks for copies of all formal and informal contact lists and duty rosters for personnel in DFS/OCS [to include Seniority list], detailing a.) assignments, b.) promotions, c.) transfers and vacancies, as well as length of time [per position, promotion, transfer, etc.] for all Supervisory, Management, and Bargaining Union Employee Personnel positions during 1999, 2000, 2001, 2002, and 2003. The discoverability of this set of information was thoroughly addressed during the discovery dispute telephone conference held on September 9, 2005. (D.I. 165.) At the end of that conference call, the parties agreed that Flax would be deemed senior to all other personnel and [*31] that there was no need for the requested list. Because no basis other than that already addressed during the conference call has been advanced to show the relevance of this information, Request Number 8 is moot.

Request Number 12 asks for a copy of all documentation in the State's possession in response to the Plaintiff's December 28, 2002, letter to the State's Treasurer. The State responded that the information was being sought and that it would respond as appropriate upon receipt and review. Flax indicated that he is still waiting for the "audit report". The State responded in its most recent filing that it provided Flax with almost every document requested, if it was available and not

2006 U.S. Dist. LEXIS 58293, *31

privileged. So there is no confusion, the State shall forthwith provide its response to Request Number 12, be it that an objection was lodged, that the documents do not exist, or that the documents have been produced.

Request Number 22 asks the State to produce a list of all documents being withheld from production by virtue or any privilege of non-production or for any other reason. The request states that the "list should identify each document by its name, date, author, and recipient, and specify [*32] the reason for withholding it from production." The State responded that it would "review the file for such documents and supplement this response." The State did not object to Request 22, so any objection is waived. So there is no confusion, the State shall forthwith provide the promised supplemental response to Request Number 22.

**D. Plaintiff's First and Second Set of Interrogatories**

I conclude that the State has adequately responded to the First Set of Interrogatories Numbers 1, 2, 3, 4, 6, 7, 8, and 9. (D.I. 130, 131.) The State's objections to Plaintiff's First Set of Interrogatories are well-taken and are sustained.

**E. The State's July 19, 2005 letter and Flax's Response**

There is no discovery dispute currently at issue. These two letters (D.I. 147, 148) refer to Flax's motion for sanctions based upon discovery. Hearing was held on the issue on July 26, 2005. (D.I. 151.) The parties presented their respective positions, and the motion was stricken.

**F. Plaintiff's Third Request for Admissions**

The State has adequately responded to Flax's Third Request for Admissions, Numbers 12, 15, and 17. (D.I. 149.)

**G. Depositions**

The issue raised by Flax concerns [*33] the conduct of counsel for the State during the taking of depositions. Flax discusses what appears to be information he received during depositions of certain individuals. While not clear, it appears that Flax believes he is entitled to certain documents and discovery based upon the testimony and his exchanges with the deponents. These documents include: 1) the telephone list and roster of all DFS or Children Service Personnel, 2) forwarding information for former DFS employees Mr. Langson and Ms. Stokes, 3) promotion dates and a list of the personnel holding various jobs and seniority list, and 4) documentation from the EEOC contact person and the ADA administrator of Flax's visit and complaint of race discrimination at the time of his hire.

Flax indicates that he has been advised that forwarding information does not exist for a Mr. Langston and Ms. Stokes. Information cannot be produced if it does not exist. Therefore the request is denied. With regard to promotions and lists of personnel in their various jobs, as discussed above, the parties agreed during a telephone conference with the court on September 9, 2005, that for all purposes in this case Flax had seniority over other [*34] employees. Finally, Flax was hired by the State in 1997, and, as alleged in the complaint, the employment discrimination did not occur until May 2002. I am hard pressed to see the relevance of a race discrimination complaint made by Flax in 1997 prior to his employment with the State or to see what his contacts with the EEOC at that time have to do with his current complaints of employment discrimination. Accordingly, I conclude that Flax is not entitled to the information. Finally, if the State has not already done so, and if the documents exist, the State shall provide to Flax the telephone list and roster of all DFS or Children Service personnel for the relevant time period.

In prior telephone conferences Flax has raised the issue of conduct by counsel during depositions and was advised by me to be specific when seeking relief in such a dispute. In his June 30, 2006 letter he references three events. During the deposition of C. Charkow, Flax asked the deponent for a list of supervisors and job titles. (D.I. 191 at VI. 3.) Whereupon counsel for the State stated, "I've taken your request, Mr. Flax, and I've sent it on. We didn't forget you." Flax then refers to counsel's "comments [*35] towards the end of page 39...]." In the same vein Flax refers to counsel for the State when he deposed Mr. N. Coleman and requested EEOC documents. He refers to "[And, finally, Mr. Neidzielski's interjections from pages 10, 11, 12.]". *Id.* at VI. 4.

The one specifically quoted comment Flax objects to is not objectionable. Counsel for the State merely indicated that the discovery request was under consideration. The other two occurrences lack sufficient specificity, despite my requests that Flax specifically identify discovery problems. As a result, I am unable to